The J. S. DILLON & SONS STORES CO., Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 7608.

United States Court of Appeals
Tenth Circuit.

Nov. 25, 1964.

William G. Haynes, of Lillard, Eidson, Lewis & Porter, Topeka, Kan. (O. B. Eidson, Philip H. Lewis, James W. Porter, Charles S. Fisher, Jr., Peter F. Caldwell, Roscoe E. Long, R. Austin Nothern and Brock R. Snyder, Topeka, Kan., on the brief), for petitioner.

Anthony J. Obadal, Attorney, N.L.R.B. (Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B. and Elliott Moore, Attorney, N.L.R.B., on the brief), for respondent.

Before PICKETT, BREITENSTEIN and HILL, Circuit Judges.

PICKETT, Circuit Judge.

This case is before the court on a petition of the J. S. Dillon & Stores Co., Inc., to review an order of the National Labor Relations Board and on the Board's petition to enforce the order. The Board found that petitioner violated § 8(a) (1) of the Act, 29 U.S.C. § 158(a) (1), by interfering with, restraining, or coercing its employees in the free exercise of their rights guaranteed by § 7 of the Act, 29 U.S.C. § 157. The alleged unfair labor practices are predicated upon three acts, prior to a representation election, of alleged misconduct consisting of: (1) threats of reprisal if employees were unionized; (2) attempts to influence employees in the representation election by changes in working conditions; and (3) threatened deprivation of certain fringe benefits to part-time employees if a union contract were negotiated. The sole question is whether there is substantial evidence in the record as a whole to support the Board's order.

The petitioner operates retail food outlets in Colorado and Kansas, and a food warehouse at Hutchinson, Kansas. This dispute involves only the Hutchinson warehouse. The warehouse is made up of six separate departments; maintenance, trucking, general office, cafeteria, advertising and warehouse. The warehouse department is divided into shipping, receiving, grocery and produce functions. On February 15, 1963 the union [1] filed a representation petition seeking to be designated the bargaining agent for all production, maintenance, warehouse and shipping employees, and the over-the-road truck drivers at the warehouse.

The alleged threats of reprisal made to the truck driver Bridgewater by Caywood, the supervisor of trucking, occurred during the course of a conversation between the two men in the latter part of February.[2] Bridgewater testified that he was aware of the union's organizational drive at the time Caywood talked to him. He testified that Caywood indicated he had heard of union talk, and stated that " * * * 'We can't have that here. Ray Dillon has to keep his boys happy and he can't do it with agitators around.' " Bridgewater also said that "He told me that we didn't need a union. He said Dillon could handle things there themselves, they were doing a pretty good job. If we did go union, they could put these tattletales, or whatever it is on the trucks and we would cut out coffee breaks and it would be rough on us. * * * He (Caywood) said he had been in the union. He said he worked for the railroad and in the railroad they needed it, at Dillon's they just didn't need it." Bridgewater said Caywood told him " 'You know how I (Caywood) stand on this union. * * * I told you before how I stand.' " Bridgewater said that he "took that for granted," that Caywood was referring to a conversation they had "two or three years ago" at which time Caywood told him "that was the first

1. District 50, United Mine Workers of America.

2. Bridgewater is the only one who testified as to this conversation. Caywood did not testify at the hearing.

thing he would fire a man for is talking union." There is no evidence that Caywood was referring to this particular statement. On cross-examination Bridgewater testified as follows:

"Q. (By Mr. Haynes) The conversation, as I understand it now, was to the effect that if the employees, if the truck drivers became organized, the operation would be run on a tighter schedule? A. Yes.

"Q. Is that true? A. Yes.

"Q. Is that all the comment, was there any comment about whether or not this would come about if there were economic demands made upon the company by the union which would require them to tighten up to compensate for these demands? Was there anything like that discussed? A. No, but I figured that in."

The Dillon-Hobbick conversation which the Board also found constituted threats of reprisals, took place about the first of March, 1963.[3] This meeting came about as a result of Hobbick's request at a welfare committee meeting to discuss some matters concerning only the girls in the repack department.[4] She said that some of the girls had raised questions about vacation periods and about the possibility of a more regular work basis. These five employees were classed as regular part-time help because their employment depended upon the demand for produce. Hobbick testified that in response to an inquiry about their fringe benefits of insurance, vacation, and sick pay, they were told that to the best of Dillon's knowledge, no union could cover part-time help, and that with a union contract they could lose these benefits. Dillon testified that these five were the only part-time employees who presently received such benefits. Hobbick testified they were "told to weigh the pros and

cons of anything we heard concerning the union, that the union doesn't always carry out everything they promise." Hobbick testified as to Dillon's statement in the following manner:

"Q. In other words, he gave an example of what he knew to the best of his knowledge? A. Yes, Sir, I would say so. * * *

"Q. He didn't say if the union came in the company was going to unilaterally— A. (Interrupting) We would lose our benefits but the company couldn't help it.

"Q. Did he say you would or you might? A. I couldn't say.

"Q. Did he say anything about this is a matter of negotiations and it was beyond his control? A. He did say he didn't know exactly what the result would be."

Harold Ryan, Personnel Director for the Company, testified with regard to the same meeting that the employees were "absolutely not" told that if the union became their bargaining representative they would lose their fringe benefits. He said they were told that if they were under a contract such as the company had in Colorado, the part-time employees would not receive such benefits.

Dillon testified that he told the five employees about the Colorado contracts, and stated that if the warehouse had the same type, "I thought they would be outside the contract." He denied telling them that they would lose fringe benefits if the union became their bargaining representative. On cross-examination, Dillon stated: "I told them that the contracts we had in Colorado, if these were to apply in Kansas, that I thought they would not come under the contract, but I didn't say they would lose anything." Actually, there is very little conflict in the testimony of Hobbick, Ryan and Dillon.

---

3. Present at this conversation were Barbara Hobbick and the four other women who constitute the repack personnel of the produce department; Ray Dillon, Jr., president of the company; Harold Ryan, personnel manager; Claude Creel, warehouse manager; and Phil Christianson, repack function supervisor.

4. Hobbick had previously been selected as welfare committee representative of the repack unit.

The third act which the Board found to constitute an unfair labor practice arose from an alleged change in working conditions when the company furnished new brooms, rubber mats, knives, and a radio to certain employees as a result of a request made during a welfare committee meeting. Hobbick testified that when the girls in the grocery warehouse asked for these items to aid in their work, that she (Hobbick) stated that if the company "could provide them with mats I asked if they could get us some." She said they received the requested mats about two weeks later. Hobbick also said that no one in her department had a rubber mat before, except when they bought their own. She said they have never had a radio.

Ryan testified that other departments had music and that the employees in the pricing department of the grocery warehouse wanted to know why they couldn't also. He said the mats were requested by the same department since increasing the number of workers, there were not enough mats to go around. Ryan stated that the additional knives and brooms were furnished for the company's efficiency. Ryan indicated that a company radio had been in the department for some years, but had been inoperative for about two years until an employee repaired it.

The general rule is that the Board's findings will not be disturbed if they are supported by substantial evidence, considering the record as a whole. NLRB v. George Groh and Sons, 10 Cir., 329 F.2d 265. However, " * * * a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456; Bon-R Reproductions, Inc., v. NLRB, 2 Cir., 309 F.2d 898; NLRB v. Latex Industries, Inc., 6 Cir., 307 F.2d 737. Applying these criteria to the present case, it does not appear that the findings of unfair labor practices have the support of the requisite substantial evidence.

As to the Caywood-Bridgewater conversation, the testimony was primarily to the effect that Caywood was expressing an opinion as to the necessity of union organization. Section 8(c) of the Act, 29 U.S.C. § 158(c), provides:

> "The expressing of any views, arguments, or opinion * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

This requires that the threats be expressed, and the fact that an employee "figures" a threat into an otherwise innocent conversation does not make an unfair labor practice. The Act condemns only improper influence which is in the nature of coercion. NLRB v. Colvert Dairy Products Co., 10 Cir., 317 F.2d 44; Coppus Eng. Corp. v. NLRB, 1 Cir., 240 F.2d 564. The same reasoning is likewise applicable to Bridgewater "taking it for granted" that Caywood was referring to an anti-union statement which he allegedly made two or three years previously. The connection is too remote. Without something more than an employee's supposition to connect the previous statement with Caywood's present remarks, the earlier statement, assuming it was made, does not even tend to shed light on the true character of the occurrence. Cf. NLRB v. Shawnee Industries, Inc., 10 Cir., 333 F.2d 221. Moreover, such an isolated statement to a single employee, unless it indicates a course of conduct, may not be justification for a finding of an 8(a) (1) violation. Union Carbide Corp. v. NLRB, 6 Cir., 310 F.2d 844; NLRB v. Mississippi Products, Inc., 5 Cir., 213 F.2d 670, 674; NLRB v. Grunwald-Marx, Inc., 9 Cir., 290 F.2d 210.

**400**

■ The statements made during the meeting referred to as the "Dillon-Hobbick conversation" contains even less of what might be construed as threatening than did the Caywood-Bridgewater conversation. By Hobbick's own testimony, Dillon purportedly stated that he did not know what the results might be if the union contract were made. The efforts of an employer to convey the impression that a union would not be beneficial to employees are not prohibited if those efforts are not coercive. NLRB v. Enid Co-Op Creamery Ass'n, 10 Cir., 169 F.2d 986; NLRB v. Continental Oil Co., 10 Cir., 159 F.2d 326; Coppus Eng. Corp. v. NLRB, supra; NLRB v. Colvert Dairy Products Co., supra. In discussing with employees the pros and cons of the benefits of union representation, an employer has the right to compare present benefits with those of unionized plants so long as there is no coercion.

■ As to the change of working conditions brought about at the request of a competing labor organization, (the Welfare Committee), by providing brooms, knives, mats, etc. to certain employees, the testimony was that this Welfare Committee had been in existence for approximately 15 years and appears to have been a regularly used vehicle of communication between employer and employees throughout the warehouse. It was used for purposes ranging from providing flowers to sick and injured employees and arranging warehouse parties, to the presentation of grievances concerning wages, hours, vacations, and other working conditions to management. It was also shown that the department requesting the additional supplies already had some of the items, but due to an increase in personnel, did not have enough to go around. The items furnished were such as had been used in the past by the employees, except for the mats furnished Hobbick and her four co-workers. They were items which were needed for the efficient operation of the warehouse. The furnishing of such trivia can hardly be compared with wage adjustments such as in

May Dept. Stores Co. v. NLRB, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145, rehearing denied 326 U.S. 811, 66 S.Ct. 468, 90 L.Ed. 495, or the offer of rest periods and shift rotation as in Joy Silk Mills v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732, cert. denied 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350. We have held that wage increases may be an unfair labor practice. NLRB v. Burton-Dixie Corp., 10 Cir., 210 F.2d 199; Wheatland Electric Coop. v. NLRB, 10 Cir., 208 F.2d 878, cert. denied 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108. There is no such case here.

The order of the Board is vacated, and the petition for its enforcement is denied.