**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**MORRIS NOVELTY CO., Inc.,
Respondent.**

**No. 18569.**

United States Court of Appeals
Eighth Circuit.

June 19, 1967.

Lawrence M. Joseph, Atty., N. L. R. B., Washington, D. C., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Charles A. Caffrey, Atty., N. L. R. B., Washington, D. C., were with him on the brief.

Glenn L. Moller, of Moller, Talent & Kuelthau, St. Louis, Mo., for respondent and filed brief.

Before BLACKMUN and MEHAFFY, Circuit Judges and HARPER, District Judge.

MEHAFFY, Circuit Judge.

The National Labor Relations Board has petitioned this court pursuant to § 10 (e) of the National Labor Relations Act, 29 U.S.C.A. §§ 151–166, for enforcement of its order by a three-member panel directed against Morris Novelty Co., Inc., respondent, which Company is engaged in the business of distributing and servicing amusement and vending machines in the St. Louis, Missouri area.[1]

The Board found that the Company violated § 8(a) (1) and § 8(a) (5) of the

1. The decision of the N.L.R.B. is reported in 157 N.L.R.B. No. 121.

Act.[2] The Board's finding on § 8(a)(1) was that the Company threatened employees with loss of certain benefits, promised a better insurance program than the Union could secure, and promised and established a procedure for handling employee grievances.[3] Additionally, the Board found that the Company violated § 8(a)(5) of the Act by refusing, after a valid and timely demand, to recognize and bargain with the Union as the majority representative of its employees in an appropriate unit. Based on these findings, the Board's order required Morris to cease and desist from interfering with, restraining or coercing employees in the exercise of their statutory rights, and, affirmatively, to bargain with the Union upon request, and also to post appropriate notices. We deny enforcement for lack of record evidence to support the Board's findings.

Morris Novelty is a small company located in St. Louis, employing thirteen people exclusive of clerical help. Louis D. Morris is President and Marvin E. Mitchell is Vice President of the Company. The work schedule for its employees was both generous and loose. The employees were not required to report to work at any fixed time; they normally scheduled their own work and left for home considerably before normal quitting time, depending upon their daily work schedule; they took their lunch time when they saw fit; and used company automobiles and trucks for private errands and trips with the knowledge and consent of the Company. Morris paid its employees a 2% bonus in excess of that paid by competitive companies; expended money for customer Christmas gifts as good will without participation by employees; and, unlike competitive companies, paid all federal and city licenses without charging employees any portion thereof. Morris paid its employees full wages during the first two weeks of any illness and half time for an additional eight week period. All employees were given a one week paid vacation the first year and two weeks in subsequent years. Additionally, Morris gave its employees tax absorbed cash bonuses at Christmastime, and paid employees on an hourly basis for a forty hour week, when in fact they ordinarily worked approximately thirty to thirty-five hours. Its custom was to cosign notes for employees in need of additional funds. In fact, the Company operated more like one big family than a modern business concern, and, because of its liberality and intimacy, the employees were in constant touch with management in a friendly relationship.

Sometime in the fall of 1963, Catlett, one of Morris' mechanic employees, attended a Union meeting at which there were some twenty in attendance, some from competitive companies. Shortly thereafter, Mitchell asked Catlett whether he had attended the meeting, and upon being advised that he had Mitchell asked him what progress had been made. Catlett replied that those in attendance had decided to ask for an hourly wage of $3.00. Mitchell commented that he hoped they would not go too far out of line. This was a friendly conversation and Catlett volunteered to Mitchell that he had signed a Union card. During the same month, which was probably December, 1963, Mitchell asked employee Watson if he had been to a Union meeting the previous night. Watson replied he had not been to the first meeting but had been to the second one. These instances of interrogation occurred more than six months before the charges were filed.

Thereafter, on January 29, 1964, Colvis, a Union agent, wrote Morris claim-

2. "§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\*　　\*　　\*　　\*　　\*

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

3. The Union involved is the United Industrial Workers of Seafarers' International Union of North America, AFL-CIO.

ing that the Union represented a majority of its employees and requested contract negotiations. Immediately upon receiving the letter, Mitchell called Colvis and agreed to meet him at any time during working hours at Colvis' convenience. On February 3, 1964, Colvis, accompanied by two others, called on Mitchell, claiming to represent a majority of the Company's employees. A conversation ensued about the appropriateness of organizing on an industry-wide effort. Mitchell advised Colvis that only Mr. Morris had authority to deal with the Union and that he was on vacation and would not return to the city until late March or early April. When Colvis said that the Union represented a majority of the employees, Mitchell requested the names of the card signers, but Colvis refused to give him the names. Shortly after this meeting, Colvis telephoned Mitchell and asked for Mr. Morris, and was reminded that Mr. Morris would not be back until the latter part of March. Colvis then had a talk with Union attorney Harold Gruenberg, and Gruenberg sent a letter to Mr. Morris, advising that he represented the Union and that the Union represented a majority of the employees in the "classifi-

cation of mechanics, collectors and helpers excluding clericals, supervisors and guards" and demanded recognition for employees in such unit and requested meetings.[4] This letter acknowledged that Morris was President of the Association of pinball and novelty machine operators and distributors in the Greater St. Louis area, and advised that the Union represented a majority of all mechanics, collectors and helpers employed by the member firms of the Association, and demanded recognition. Upon receipt of this letter, Mitchell promptly called Gruenberg, advising that such matters would have to be referred to Mr. Morris and giving Gruenberg the name of the Association's attorney. Nothing further was heard from the Union for some three and one-half months, at which time Morris received a copy of the Union's petition to hold an election. This petition did not seek an election in the Association-wide unit, which Gruenberg's letter had indicated they were attempting to organize, but petitioned for an election only among Morris employees. The election was duly held on July 14, 1964, with three employees voting for Union representation and ten against. The Union filed objections to the election, and, after

---

4. "February 13, 1964

* * * * *

"Dear Mr. Morris:

"This law firm represents United Industrial Workers Union of the Seafarers International Union, AFL-CIO. Written notice was served upon you by letter of the fact that the said Union represents a majority of employees of Morris Novelty Company in the classification of mechanics, collectors and helpers excluding clericals, supervisors and guards. The said Union has demanded recognition for employees in such unit of Morris Novelty Company and has requested meetings to the end that a collective bargaining agreement may be reached.

"Last week Mr. Louis Colvis of the Union met with Mr. Mitchell of your company and Mr. Mitchell suggested that association-wide bargaining would be appropriate. We are advised that you are the president of an association of pinball and novelty machine operators and distributors in the Greater St. Louis area. You are hereby advised by United Indus-

trial Workers of the Seafarers International Union, AFL-CIO that it represents a majority of all mechanics, collectors and helpers employed by the member firms of your association and the said Union hereby demands recognition of your association as collective bargaining representative of employees in such unit. It is further requested that your association officers meet with Mr. Louis Colvis for the purpose of commencing negotiations upon the terms and conditions of a collective bargaining agreement.

"You are requested by return mail to notify Mr. Louis Colvis, United Industrial Workers Union of the Seafarers International Union, AFL-CIO, 805 Delmar, St. Louis 1, Missouri of the date, time and place convenient to your association for a meeting at which contract negotiations will be initiated.

"Very truly yours,
Gruenberg, Schobel & Souders
By /s/ Harold Gruenberg
Harold Gruenberg"

a hearing but before a decision was rendered thereon, a stipulation was entered into by Morris, the Union and the Board. The stipulation provided that, in order to save time and avoid the inconvenience and expense of further litigation, the Regional Director could set aside the results of the election and conduct a new election. On September 8, 1964, pursuant to said stipulation, the Board set aside the election and ordered the Regional Director to conduct a new election. Instead of holding a new election, however, the charges in the instant case were filed and prosecuted.

### § 8(a) (1)—Interference, Restraint and Coercion.

The conversations hereinbefore recited were had in late 1963, more than six months prior to the filing of the charges here, and, therefore, could not under § 10 (b) of the Act be the basis for the complaint. The Board did not find that said conversations constituted an unfair labor practice, but did consider the evidence as background for what it asserts was the continuation of "an unlawful course of conduct designed to thwart the employees' aspirations for Union representation, which continued until after the election." The conversations were friendly and completely lacking in any inference that would demonstrate hostility or antiunion animus. However, in the latter part of June, after the Union had filed its petition for election, Mitchell spoke to four or five employees who were congregated in the office and a discussion ensued in which Mitchell said that unionization might result in "curtailing the use of automobiles for private use," and possibly the utilization of a time clock and the establishment of regular working hours. The Trial Examiner described this statement thusly:

"Vice President Mitchell, during the latter half of June 1964, pointed out to employees directions in which, to meet increased costs which 'could' follow upon the advent of the Union, Respondent 'might' have to turn in searching for economies—tightening up on work schedules, eliminating employees' use of company cars, and curtailing their use of the company truck."

■ Mitchell's remarks constituted only his opinion of what possibly might occur upon increased labor costs resulting from unionization. It was a plain, simple statement of obvious facts of economic life. It was undisputed that the employees were given many fringe benefits over and above those received by employees in competitive companies, and by no stretch of the imagination could such a statement constitute an unfair labor practice or be construed as any interference, restraint or coercion. This statement constituted no threat of reprisal or force or promise of benefit and was clearly protected by § 8(c) of the Act.[5] In construing this section in Texas Industries, Inc. v. N. L. R. B., 336 F.2d 128, 130 (5th Cir. 1964), the court said:

"It is well settled that under § 8(c) the employer must be regarded as a rightful contestant for his employees' loyalty in a union election. This section permits an employer to state his legal rights under the Act and to predict that dire economic consequences will follow from a union victory. (Citing cases.)"

This court and others have many times held stronger statements by company representatives to be nonviolative of the Act. N. L. R. B. v. Superior Sales, Inc., 366 F.2d 229, 235–236 (8th Cir. 1966); N. L. R. B. v. Herman Wilson Lmbr. Co., 355 F.2d 426 (8th Cir. 1966); N. L. R. B. v. Mallory Plastics Co., 355 F.2d 509 (7th Cir. 1966); Caribe General Elec-

5. § 158(c):
"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not consti-

tute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

tric, Inc. v. N. L. R. B., 357 F.2d 664 (1st Cir. 1966).[6]

Next, the Board alleges in its brief that interference, restraint and coercion occurred in a meeting held subsequent to the time at which the election was scheduled. It is asserted that Morris promised a better insurance plan than the Union could secure. When Colvis, the Union representative, first called on Mr. Mitchell he left with him what is referred to as a "blue book" which, among other things, contained reference to an insurance plan offered by the Union. The employees were covered by Blue Cross-Blue Shield and the Company was paying one-third of the premium cost. While it is most unlikely that any mention was made at the meeting about insurance, never at any time did the Company promise to procure for the employees an insurance plan. The meeting alluded to in the Board's brief was attended by all of the employees of Morris Novelty, and Mr. Morris read a prepared statement. Of the four employees who testified concerning the meeting, only one—Catlett, an admitted Union adherent—testified that Mr. Morris said anything about insurance at the meeting. More likely, insurance was mentioned after the election, but, even so, it was only an expression of opinion that a better insurance plan could be obtained, and was completely devoid of any promise that the Company would pay for insurance for employees. At most, it could be interpreted that Mr. Morris probably could locate a company for the employees which would give them more benefits for their money. As a matter of fact, Mr. Morris did contact an insurance broker and submitted a policy to the employees but with exactly the same Company participation as had long been the Company's policy, i. e., to pay one-third of the premium cost. There is simply no evidence whatsoever of promise of benefit or coercion or, in fact, any actual promise to provide a better insurance plan than the Union's.

Finally, the finding of promise of benefit by "agreeing to establish a procedure for hearing employee grievances" is specious in that there is no record evidence whatsoever to support it. At the general meeting attended by all the employees prior to the election above referred to, one of the employees—Laspe, the self-described "number one griper" —started to complain that on occasion employees had to go out and make nickel calls at locations of other salesmen. When Laspe interrupted the meeting, Mitchell told him that it was not the place to raise such a matter and that if he or the men wanted a gripe session, they might select one man to present it or they could meet as a group and each could voice any complaint he might have.

6. The Board in its brief attempts to buttress its conclusions by reference to statements of Morris characterizing this Union as small and belonging at sea and not in the pinball business, and urging the employees to "stick with us and I will take care of you." These statements considered in proper context do not constitute statutory violations. In N. L. R. B. v. Colvert Dairy Products Co., 317 F. 2d 44, 46 (10th Cir. 1963), the court stated:

"It has often been said that the general purpose of the National Labor Relations Act is to balance the interests of management, labor, unions and the public interest so as to accomplish harmony in furtherance of the welfare of each. In broad outlook a mutuality of interests exist but in the administration of the Act in specific cases the reality is a hard, and too often, bitter conflict of interest. The campaign immediately preceding a Board election is usually such a situation and the Act provides both affirmative rights and prohibited acts governing the conduct of both management and union. Each is accorded the right of persuasion and denied the use of coercion. But it would be unrealistic indeed to expect management to use words of conviction in an effort to persuade an employee to vote against unionization without the presence of 'antiunion animus.' In the matter of the election the management is, of course, antiunion. The union is equally anticompany. It is necessarily so. And hostility toward each other in such regard is not an unfair labor practice."

After the election, Laspe's grievance about nickel calls was adjusted. There was nothing unlawful in Mitchell's statement, regardless of when it was made, and it constituted no promise of benefit.

Running throughout the testimony of every witness is a thread of friendly relationship and employee freedom to discuss with Morris or Mitchell any personal or business problem. Obviously, any man or group of men could and did talk with Morris or Mitchell individually and collectively as indicated by the meeting when Mitchell walked into the office and encountered four or five men and the discussion ensued as to the possible effect on fringe benefits in the event of unionization.

### § 8(a) (5)—Refusal to Bargain.

The Union at no time offered to prove its majority or to demonstrate an appropriate bargaining unit.

On January 29, 1964, the Union wrote Morris Novelty claiming to represent its employees. On February 3, 1964, Colvis, the Union representative, called on the Company and it was at this time the conversation ensued with reference to organization of the Association. It was also at this conference that Mitchell told Colvis that the matter would have to be taken up with Mr. Morris who would not return to the city until a later date. Further, at this meeting Mitchell asked the Union representative how many of the employees had requested Union representation, and his reply was "over fifty per cent of them." Mitchell asked Colvis to give him the names of the employees, but Colvis refused. Thereafter, the Union's attorney wrote the letter (footnote 4) demanding recognition. The Union's attorney was immediately advised to get in touch with the attorney for the Association, but this was not done. The Company heard nothing more until the Union filed a petition with the Board seeking an election.

The Union never at any time claimed but eight signed cards. Employee Landwehr testified that he signed a card after he heard that it would not cost him anything if he signed then, but later it would. Employee Clements, before he signed his card, heard several times at a Union meeting that if he did not sign a card before the organization was completed, he would have to pay an initiation fee of up to $200.00. Employee Rice was told by Catlett, who the Trial Examiner found to be a Union agent, at the time he signed the card that he could get into the Union free by signing then, whereas later on they were going to try to impose a $25.00 to $50.00 penalty. It is undisputed that employees Clements and Rice talked with Mr. Morris before they signed their cards, advising him that it was their understanding that if they did not sign until later they might have to pay a fee in the neighborhood of $200.00. Employee Montrey attended a Union meeting at which the chairman mentioned there would be an election and that he would get to vote in that election. Another employee testified that he signed a card under the impression that it was necessary in order to be eligible to vote. It is significant that when these employees came to the employer and asked his advice, they were told that if he were faced with any such penalty he would, under such circumstances, sign the card and vote as he pleased. It is against this background that the Board held that the Company did not have a good faith doubt of the Union's majority status, constituting a violation of § 8(a) (5) of the Act. Thirteen employees were involved. The undisputed evidence is that the Company knew that a number sufficient to destroy the majority had signed cards either to avoid a penalty or under the mistaken notion they could not otherwise be eligible to vote. Both Company and Union officials had advised that there would be an election.

In our recent case of N. L. R. B. v. Johnnie's Poultry Co., 344 F.2d 617 (8th Cir. 1965), we denied a petition for enforcement where the Board determined that the employer had not acted in good faith in refusing to recognize and bar-

gain with the Union. In that case, some of the employees had been told that initiation fees would be waived and at least three of the employees signed cards on the belief they were only requesting an election. Here, some of the employees signed under the belief that initiation fees would be waived and at least one signed because he thought he had to sign to become eligible to vote. In *Johnnie's Poultry*, we held there was no substantial evidentiary basis for the Board to draw a reasonable inference that the employer did not act in good faith in refusing to recognize the Union and bargain with it.

It was stated by the court in Edward Fields, Inc. v. N. L. R. B., 325 F.2d 754, 761 (2nd Cir. 1963), that "the duty to bargain arises only at such times as the union representative presents convincing evidence of majority support." The Union here neither presented nor offered to present evidence of its majority support. Morris was justified in doubting that a majority of its employees desired Union representation and, under the circumstances, would certainly have risked an unlawful act by entering into an agreement with the Union. International Ladies' Garment Workers' Union, AFL–CIO v. N. L. R. B., 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

We have already noted that at the time of the alleged § 8(a) (5) violation, the Union attorney's ambiguous letter did not make it clear whether the Union was seeking an Association-wide unit or a Morris Novelty unit. Additionally, when the petition for certification was filed, the unit was described as Morris' "mechanics, helpers, truck drivers, and maintenance employees." Five of the thirteen employees were commission salesmen and at the time of the representation hearing the Union attorney stated that he was taking no position as to the commission salesmen, but preferred to hear the evidence before determination of the propriety of their inclusion in the unit. At the conclusion of the evidence, it was stipulated that an election among "all employees * * *, ex-cluding office clerical and professional employees, guards and supervisors as defined in the Act" constituted the unit.

In N. L. R. B. v. Jackson Press, 201 F.2d 541 (7th Cir. 1953), the court stated at 544–545:

"In several cases, the Board has considered situations where there was ambiguity as to the unit of employees which was covered in a representation petition. Applicable here is the statement of the Board in Bailey Grocery Co., 100 N.L.R.B. No. 94, 30 L.R.R.M. 1321, 'In view of the prohibition of the Act against recognition by an employer of a union which does not represent a majority, we do not believe it incumbent on an employer to resolve an ambiguity in a request to bargain. On the contrary we believe that a union representative, who is presumably versed in labor matters, should clearly define the unit for which recognition is sought. Such a requirement imposes on the union representative only the obligation to say what he means. Failing to do so, he cannot be considered as having made the sort of request to bargain which imposes upon an employer a legal obligation to comply.' "

We said in Fort Smith Broadcasting Co. v. N. L. R. B., 341 F.2d 874, at 880 (8th Cir. 1965):

"A bargaining representative which seeks to enforce its right concerning an employer under § 8(a) (5) must show that it has been designated by a majority of the employees, that the unit of representation is appropriate, and that there has been both a demand that the employer bargain and a refusal of recognition by the employer in the absence of any good faith doubt as to the union's majority status. United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 69, 76 S.Ct. 559, 100 L.Ed. 941 (1956)."

■ The record here is absent of any testimony that would impugn the motives of Morris or would infer that it refused or delayed bargaining for the

purpose of gaining time in which to undermine the Union or dissipate its claimed majority. Contrarily, it is uncontradicted that Morris had knowledge that several of the employees signed the cards merely to guard against possible penalties or under the mistaken notion that signing was necessary to establish eligibility to vote. Obviously, a defection of only two of the card signers would have eliminated the claimed majority and the Company was justified in doubting at all times the claimed majority status. Thus, there is no record evidence to justify the Board's finding of a § 8(a) (5) violation. See and compare Pizza Products Corp. v. N. L. R. B., 369 F.2d 431 (6th Cir. 1966), and cases therein cited.

Morris Novelty raised other defenses, including refusal to admit evidence of facts assertedly calculated to influence the employees' vote; and a stipulation entered into by the parties for another election, recommended by the Board's Regional Director and ordered by the Board, but never held. Our conclusions, however, that the record is devoid of any substantial evidence to support either the § 8(a) (1) or § 8(a) (5) charges preclude occasion to discuss other issues.

Enforcement is denied.