**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The GOLUB CORPORATION and Mechanicville Central, Inc., Respondents.**

**No. 62, Docket 31212.**

United States Court of Appeals Second Circuit.

Argued Oct. 3, 1967.

Decided Dec. 1, 1967.

Lawrence M. Joseph, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William J. Avrutis, Washington, D. C., Atty.) for petitioner.

J. Leonard Schermer, St. Louis, Mo. (Shifrin, Treiman, Schermer & Susman, St. Louis, Mo., Thadeus Niemira, St. Louis, Mo., on the brief, Leon Novak, Schenectady, N. Y.), for respondents.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The NLRB seeks enforcement of an order relating to alleged unfair labor practices of Mechanicville Central, Inc., one of a chain of retail food stores which are wholly-owned subsidiaries of The Golub Corporation. The challenged practices stem from an organizing drive conducted by Amalgamated Meat Cutters, Butchers Workmen and Store Clerks of North America, District Union Local No. 1, AFL-CIO. On December 8, 1964, the union sent a telegram to the company claiming it held authorization cards signed by a majority of the 31 employees in the Mechanicville store, offering to submit these to a disinterested person,

and requesting a meeting. On the same day it filed a petition for certification. On January 18, 1965, the Regional Director ordered an election for February 17. The company sent employees three letters, dated February 2, 8 and 12, arguing against the union. In another letter of February 11 it invited employees and their spouses to attend a dinner meeting on February 16, advising that they would be paid for their time. After dinner William Golub delivered a speech again arguing against the union.

The union lost the election 24–4 but the Regional Director set the vote aside because Golub's speech violated the 24 hour rule set forth in Peerless Plywood Co., 107 N.L.R.B. 427 (1953). Later he approved the union's request to withdraw its certification petition. Meanwhile unfair labor practice charges had been filed and a complaint issued. The Trial Examiner found that the union had received valid authorization cards ·from a majority of the employees and that the company had violated § 8(a) (5) by refusing to bargain. He also held certain passages in the letters of February 2 and 8 and the speech of February 16 to violate § 8(a) (1). The Board agreed.

 The Trial Examiner's conclusion as to majority status rested on the legal premise which we have declined to adopt, NLRB v. S. E. Nichols Co., 380 F.2d 438, 444–445 (2 Cir. 1967), that even though a union has led signers of authorization cards to believe that it would obtain representative status only by winning an election, a card clear on its face is valid unless the employee was told that its *sole* purpose was to obtain an election—words such as "sole," "merely," "just," or "only," being invested with a kind of talismanic quality. The union held 22 cards; 16 were needed for a majority. Even on the "sole purpose" test the Examiner invalidated the cards of Mary Rose Beniati[1] and Frank Marinello.[2] With respect to two others, John Pepe and Mary Petrignani, he conceded that their testimony, if credited, "might well furnish the basis for finding their cards to be invalid"[3] but did not resolve the issue raised by the rebuttal testimony of the solicitor of the cards since on the view he took as to other cards the validity of these two was immaterial. The Board has not asked us to enforce the order on the ground that Pepe's or Petrignani's cards were valid nor has it sought a remand for resolution of the credibility issue. Rather, conceding that the card of Marcella McCarthy also was invalid under the *Nichols* rule,[4] it seeks enforcement on the basis that there are still enough valid cards to constitute a majority. We disagree; the cards of Eleanor Carbone[5] and Vincent Zielnicki[6] were also obtained

---

1. Beniati testified that organizer Cominsky stated "that the card meant merely nothing. That it just gave him the right to petition the store if they got enough signed and if I did get in the ballot box it would be my own decision."

2. Marinello said Cominsky told him the card "was merely to get enough signed or a certain percentage and to get a vote."

3. Pepe testified that a fellow employee Russom had told him the union "needed a certain amount of names to have an election so he wanted me to sign the card so I asked him if I sign this card will I be obligated or committed in any way, he said no, he told me the whole purpose of this card is to have an election." Petrignani testified that she had told Russom she would sign the card "if everyone else was going to sign it in the store and he assured me that everyone but me had signed."

4. McCarthy testified Russom asked her if she "would sign the union card to petition for a vote in the market as to whether we wanted a union or not to have to bring a vote in the store," also that "if they got enough cards they could petition for an election."

5. Carbone testified that two men from the union solicited her signature telling her that "if they got enough people they would have a vote and the union in."

6. Zielnicki testified that a fellow employee sought his signature, saying "it didn't mean I had to vote for the union, it meant it was bringing a vote into the store," and again, as developed by the Trial Examiner, "If we have a sufficient number

by misleading the signers into the belief that the union would not become their representative unless it won an election. Freddie Russom, the solicitor who approached Pepe, Petrignani and McCarthy, had also solicited the card of Louis Peluso, telling him, in Peluso's words, that by signing a card "I didn't have to obligate myself to the union just that I would sign the card and I didn't have to join if I didn't want to," and had obtained the cards of five other employees only one of whom testified. Question has been raised whether proof of a pattern of misrepresentation by a particular solicitor may not require the General Counsel to come forward with testimony by all signers. Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851, 857–58 (1967). Compare NLRB v. James Thompson & Co., 208 F.2d 743 (2 Cir. 1953). The Trial Examiner ruled against this on the basis that, under the "sole purpose" rule, only two of Russom's solicitations could be faulted and no pattern of misrepresentation had been shown; if the correct figure was four out of five, a different result might follow. We therefore decline to enforce so much of the Board's order as holds that the company's refusal to recognize the union violated § 8(a)(5) and turn to the alleged violations of § 8(a)(1).

In contrast to many § 8(a)(1) proceedings, the violations here found consisted solely of writings and a speech addressed to the employees as a group—there was no finding of interrogation or surveillance, of discriminatory discharge, or of the grant of benefits. The case thus sharply raises the issue how far the Board may go in curbing speech consistently with § 8(c) and the First Amendment.

The Board had no criticism of the company's letters of February 11 and 12, and only faulted portions of the letters of February 2 and 8 and a rather small part of Golub's speech of February 16. To quote simply the contested passages would create a false impression; it is necessary to place them in their setting by summarizing the entire communications.

The February 2 letter began by telling the employees of the forthcoming election. It accused the union of making false promises which "you can easily find out about * * * from others" and of picking on a single store to avoid a vote for all the chain's employees. It assured employees that the ballot would be absolutely secret, that they were "protected by law from anyone who attempts to interfere with your making a free choice," and that they were not bound by having signed a union card. It then went on to say "To get you to vote for them, the Union has been making many promises— promises to make demands which could be excessive. Companies that have been forced to meet excessive Union demands have been known to be forced out of business. The employees at the other local chain (Saveway) were not fooled by Union promises and flatly rejected them just a short time ago."[7] After arguing that union membership would mean dues, assessments, other financial burdens, and possibly sympathy strikes, the letter continued:

"The retail food business is the most competitive business in the world. Customers, not Unions, help pay your wages. We bring customers into our stores if we attract them with competitive prices. Even the large chains cannot meet these Union demands without making drastic adjustments because they also have to remain competitive. Large chains which have been forced to sign up with the Unions have been known to increase the work load of all their individual employees by re-

of cards signed that we will have an election in the store." Nothing can turn on the point, relied on by the Trial Examiner, that Zielnicki had affixed his signature before the misrepresentation was made; signing an authorization card is not like delivering a negotiable instrument.

7. The last two sentences were found to have violated § 8(a)(1).

ducing the number of employees in order to offset the higher costs. They find that they have to get the same amount of work done by fewer people to remain competitive." [8]

In conclusion the company promised to write again and asked the employees to keep an open mind.

The February 8 letter began by asking the employees to "look at the true facts of what outside interference would mean to you." The first set of facts consisted of the payment of dues and other union obligations, much as the earlier letter had depicted. Then came a paragraph found to have violated § 8(a) (1) which we quote in the margin.[9] The letter went on to challenge "two false arguments"—that employees who did not sign up or vote for the union would be fired if the union won and that Central's owners really wanted a union. It urged employees not to put their future in the hands of union representatives with little interest in their need or problems, and warned that a union might cook up a dispute "just to 'keep the pot boiling' or perhaps to help one of their favorites in your store," and that choice of a union "possibly could mean long drawn out strikes." It told the employees who

planned to make their careers with the company that they did not need a union "to get the greatest benefits which this company can give and which it gives without unions" and appealed to those employees who were working their way through school or college not to foist a burden on their fellows. The letter concluded by asking how a union can "truthfully promise job security," arguing that "their exorbitant, excessive and outlandish demands often result in layoffs and even force companies out of business," and that job security really rested in sales and service to customers. Golub promised to write again, and requested the employees to "keep an open mind until the election."

Golub's February 16 speech was a long one, stretching over 10½ printed pages of the joint appendix. Only two excerpts were found to have violated § 8(a) (1). The first we quote in the margin.[10] In the second Golub dealt with the small 1% profit margin characteristic of grocery chains and the correspondingly narrow leeway for "many additional unrealistic demands which add to your overhead and expenses." He then told of a large chain which had raised prices after negotiating a union contract and as a result had been

**8.** The last two sentences were found to have violated § 8(a) (1).

**9.** "2. What does the choice of a union do to personal relationships? It means the end of a close relationship between you and your manager—or other management personnel. You certainly must recall that from time to time you may have asked the manager for some special personal arrangement or privilege which he probably gladly granted, such as time off when your children were sick, weddings, for haircuts, a school prom, emergencies at home, and to catch up on studies. If there were a union contract, such personal privileges most likely could not be granted. Special privileges could be forbidden under a contract and be in violation of the contract. In such cases, we could not deal directly with you, but only through your union representative. You will not be able to solve problems directly as we have been doing. Do not be fooled by those who tell you otherwise—especially those fellow employees

who might try to *frighten* you into thinking that they can control your job."

**10.** "We have never had tensions or misunderstanding. We have always been able to talk them out, and they are here. They bring in these tensions and these difficulties which you would be subject to under their regime. Now, don't forget also that if they were to come in that many of the human things that we are now doing as a matter of course would no longer be possible if they were here under contract. Many of the little human things like we do, like giving you privileges where you want to go out to dances or if you have to play in a basketball game, or a child is sick, or of a dozen reasons. We will always give you reasonable consideration. Under a contract we would be subject to the rules of that contract. If we did these things, we could be charged with favoritism, we would be violating our contract. These things could well go by the board as a result * * *."

required to discharge around 25% of its help and make the remaining staff "do a tougher job because they have got to do the work those who were let out have to do," and of another market, and also a discount store, that were being forced out of business due to a union contract.

While we have considered it necessary to set out the communications at some length, the basic issue is whether an employer coerces his employees in the exercise of § 7 rights, as forbidden by § 8(a) (1), when he prophesies that unionization will decrease or wholly eliminate work opportunities, increase work loads, or create greater rigidity in personnel relationships, or whether such predictions come within the protection § 8(c) affords to the expression "of any views, argument or opinion, or the dissemination thereof * * * if such expression contains no threat of reprisal or force or promise of benefit." While the answer would seem easy enough, the trend of Board decisions toward ever increasing restrictions on employer speech [11] makes it desirable to attain perspective by a brief historical survey.

Under the Wagner Act, 49 Stat. 449 (1935), which contained § 8(a) (1) but nothing like § 8(c), the Board condemned almost any anti-union expression by an employer. It was sustained against First Amendment attack by some courts including this one, on the basis that employer arguments have "an ambivalent character." Since "what to an outsider will be no more than the vigorous presentation of a conviction, to an employee may be the manifestation of a determination which it is not safe to thwart," we held that "the Board must decide how far the second aspect obliterates the first," with the substantial evidence rule available to support its decision. NLRB v. Federbush Co., 121 F.2d 954, 957 (2 Cir.

1941). The Supreme Court evidently thought otherwise. NLRB v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941), dealt with employer notices pointing out that in the fifteen years since an organization strike had failed, confidence and understanding had reigned without the existence of a labor organization in any department. It went on to state that the company would freely entertain employee grievances and that it believed the mutual interest of all could "best be promoted through confidence and cooperation." The Board found the communications a violation of § 8(1). The Court interpreted the words of the Wagner Act to avoid constitutional doubts arising from the First Amendment. It held that speech, which by its own terms was not coercive, did not violate the Act unless part of a course of conduct that was coercive.[12] As the Board appeared to have found that the employer's words had violated the Act in and of themselves, the Court remanded to the Board so that it could determine whether the totality of the employer's conduct, of which his communications were a part, coerced its employees in violation of the statute. The Board later held that it did. See Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).

This decision and the Board's rather halting response to it, see, e. g., A. J. Shawalter Co., 64 N.L.R.B. 573 (1945); Clark Bros, 70 N.L.R.B. 802 (1946), enforced on a limited basis in 163 F.2d 373 (2 Cir. 1947), constituted the background for § 8(c) of the Taft-Hartley Act, 61 Stat. 142 (1947). The Hartley bill as passed by the House provided that "Expressing any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic or visual

---

11. See, e. g., S. N. C. Manufacturing Co., 147 N.L.R.B. 809, 810 n. 1 (1964); Bernardin Inc., 153 N.L.R.B. 939 (1965); Uniform Rental Service, 161 N.L.R.B. No. 15 (1966).

12. The Court, in a dictum in Thomas v. Collins, 323 U.S. 516, 537, 65 S.Ct. 315,

326, 89 L.Ed. 430 (1945), interpreted *Virginia Electric* as deciding that an employer's attempts to persuade employees to join or not to join a union are "within the First Amendment's guaranty" and can be restricted only when "other things are added which bring about coercion, or give it that character."

form, if it does not by its own terms threaten force or economic reprisal," shall not constitute or be evidence of an unfair labor practice. H.R. 3020, 80th Cong. 1st Sess., § 8(d) (1) (1947). The reference in the bill as passed by the Senate was less clear, reading:

The Board shall not base any finding of unfair labor practice upon any statement of views or arguments, either written or oral, if such statement contains under all the circumstances no threat, express or implied, of reprisal or force, or offer, express or implied, of benefit; Provided, That no language or provision of this section is intended to nor shall it be construed or administered so as to abridge or interfere with the right of either employers or employees to freedom of speech as guaranteed by the first amendment to the Constitution of the United States. H.R. 3020, as passed Senate, § 8(c).

The Conference Committee eliminated both the "by its own terms" of the House bill and the "under all the circumstances" and the unnecessary proviso of the Senate bill. While the Act thus went less far than the House bill, the detailed analysis of the compromise which Senator Taft submitted makes clear that, at the very least, the final form limits the extent to which context can be used to impart sinister meanings to innocuous words:

The House conferees were of the opinion that the phrase "under all the circumstances" in the Senate amendment was ambiguous and might be susceptible of being construed as approving certain Board decisions which have attempted to circumscribe the right of free speech where there were also findings of unfair labor practices. Since this was certainly contrary to the intent of the Senate, * * * the Senate conferees acceded to the wish of the House group that the intent of this section be clarified. 93 Cong.Rec. 6601 (1947).

In its Annual Report for 1948 the Board announced that § 8(c)

"appears to enlarge somewhat the protection accorded by the original statute and to grant immunity beyond that contemplated by the free speech guarantees of the Constitution. For example, the Clark Bros. 'compulsory audience' doctrine has been held to be invalidated by this section of the act. Nor can a noncoercive speech any longer be held to violate the act because at other times, and on other occasions, the employer has committed other unfair labor practices. *However, words and conduct may be so intertwined as to be considered a single coercive act.* Thus where an employer delivered a speech to his employees impressing them with the fact that a union was an unnecessary outside influence which he preferred not to have in his plant, and immediately thereafter polled the employees on whether he should 'step out completely and let the business go on its own power,' the Board found that the speech and the poll together constituted a threat that, if the employees voted for the union, the employer might discontinue operations. The speech and poll jointly were therefore found to violate section 8(a) (1) of the act." 13 N.L.R.B. Ann.Rep. 49–50 (1948). (Emphasis supplied.)

The Board can draw no comfort here from the sentence we have italicized since the company is not claimed to have indulged in any conduct violative of § 8(a) (1) other than its communications to employees.

■ In the light of this history and the Supreme Court's more recent warning of the dangers of ever finding an unfair labor practice in employer argument alone, see NLRB v. Exchange Parts Co., 375 U.S. 405, 409 n. 3, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964), we find the approach here taken unacceptable. In holding the passages we have cited to be violations, the Trial Examiner stated simply that "the letters and speech * * * were calculated to create and instill in the minds of employees a fear of loss of privileges

and economic suffering as a result of their adherence to the Union, and constituted interferences, restraint, and coercion within the meaning of Section 8(a) (1) of the Act." This is reading the Act as if § 8(c) did not exist; while there is a risk that an employer's prediction of adverse consequences from unionization may be taken as a threat to produce them, to hold that this danger alone suffices to convert a prediction into a threat of reprisal would go back to the very position of the early 1940's which § 8(c) was adopted to change. The Examiner did not advance matters by a conclusory statement that the company "exceeded the bounds of lawful expression within the meaning of Section 8(c) of the Act." Only if respondent's words contained a "threat of reprisal" did they go beyond the bounds of § 8(c). But, as the dictionaries tell us, a "threat of reprisal" means a "threat of retaliation" and this in turn means not a prediction that adverse consequences will develop but a threat that they will be deliberately inflicted in return for an injury—"to return evil for evil." Whatever vitality decisions such as NLRB v. Hearst Publications, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944), and Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301 (1941), giving weight to an agency's construction of statutory language may have generally, cf. Social Security Board v. Nierotko, 327 U.S. 358, 368–370, 66 S.Ct. 637, 90 L.Ed. 718 (1946), and NLRB v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 (1951), such considerations have little weight when the statute being enforced approaches the limits of constitutional power. In such a case we encounter the overriding principle of construction requiring that statutes be read so as to avoid serious constitutional doubt, for which it here suffices to cite Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed. 2d 1141 (1961).

■ The error of the Board in finding violations of the Act in the two passages from the letter of February 2 and the second set of remarks in the speech of February 16 predicting loss of work, harder work, or even a close-down as a result of unionization is apparent. Nothing in these communications could reasonably be interpreted as a threat to make the employees' lot harder in retaliation for their voting for the union, as in NLRB v. Cousins Associates, Inc., 283 F.2d 242, 243 (2 Cir. 1960), and Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760 (2 Cir. 1963), see 141 N.L.R.B. 1182 for a fuller statement of the facts. The only fair reading is that the employer would take these steps solely from economic necessity and with regret. NLRB v. S & H Grossinger's, Inc., 372 F.2d 26 (2 Cir. 1967), is very much in point. There the Board had found a violation of § 8 (a) (1) in employer statements that unionization would result in "less steady work" and that, although the employees always had had the security of their jobs, "under union conditions, we never know." 156 N.L.R.B. 233, 241 (1965). This court, speaking through Judge Hays, refused enforcement saying, in language equally applicable here, that "the statements did not suggest that the Grossinger management would seek to bring about any of the unfortunate conditions which they feared might occur." Still more recently, in NLRB v. River Togs, Inc., 382 F.2d 198, 202 (2 Cir. 1967), we noted that "Although the Board apparently thinks workers should be shielded from such disconcerting information, an employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition." While, as the last quoted extract suggests, what is in form a prediction could so far outrun any possible basis for it that the Board might be justified in concluding a threat was intended, as was apparently thought to be the case in NLRB v. Miller, 341 F.2d 870, 872 (2 Cir. 1965), this is a principle that must be kept within narrow limits not here approached. Congress did not

intend the Board to act as a censor of the reasonableness of statements by either party to a labor controversy even if it constitutionally could. See Linn v. United Plant Guard Workers, 383 U.S. 53, 60–64, 86 S.Ct. 657, 15 L.Ed.2d 582 (1964). We need not here consider whether the Board may set aside an election, under the principle of General Shoe Corp., 77 N.L.R.B. 124 (1948), because of an unfounded prophecy not containing a threat of reprisal. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L. Rev. 38, 75–82 (1964).

■ Although the case as to the prediction of the effect of unionization on the grant of special privileges is a shade closer, we reach the same conclusion. Golub's speech made it clear enough that he would not aim to withdraw special privileges if a union contract were signed, and certainly not to withdraw them in retaliation for the union contract, but that he feared that the rules of the contract or the union's administration of it might forbid giving such benefits to one employee unless they were uniformly given to all. The same is true of the letter of February 8 when this is read as a whole. While these fears may have been unwarranted, they were not shown to have so far transcended the bounds of reason as to justify the Board in finding them to be disguised threats of reprisal.

The principles here announced as to the application of § 8(a) (1) and (c) to employer speech conform to the rule of this circuit as stated in the cases cited above. They conform also to the rule followed in the majority of others. NLRB v. Threads, 308 F.2d 1, 8–9 (4 Cir. 1962); Texas Industries v. NLRB, 336 F.2d 128 (5 Cir. 1964); Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 759 (6 Cir. 1965); NLRB v. Hobart Bros., 372 F.2d 203 (6 Cir. 1967); NLRB v. Herman Wilson Lumber, 355 F. 2d 426 (8 Cir. 1966); NLRB v. Morris Novelty Co., 378 F.2d 1000, 1003 (8 Cir. 1967); J. S. Dillon & Sons Stores v.

NLRB, 338 F.2d 395 (10 Cir. 1964); Amalgamated Clothing Workers, etc. v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 908 (1966); Truck Drivers & Helpers Local No. 728 v. NLRB, 124 U.S.App. D.C. 289, 364 F.2d 682 (1966); Southwire Company v. NLRB, 383 F.2d 235 (5 Cir. 1967); NLRB v. TRW-Semi-Conductors, Inc., 385 F.2d 753 (9 Cir. 1967). The recent decision by a divided court in Wausau Steel Corp. v. NLRB, 377 F.2d 369 (7 Cir. 1967), may rest upon the promises and threats there made to individual employees; to the extent that it does not, we think the decision gives insufficient weight to § 8(c) and its First Amendment background.

Enforcement denied.

HAYS, Circuit Judge (dissenting):

The majority opinion demonstrates once more the inescapable truth that United States Circuit Judges safely ensconced in their chambers do not feel threatened by what employers tell their employees. An employer can dress up his threats in the language of prediction ("You will lose your job" rather than "I will fire you") and fool judges. He doesn't fool his employees; they know perfectly clearly what he means.

*Virginia Electric & Power* authorized employers to announce their opposition to unions; it did not legalize threatening language. And Section 8(c) expressly excepts threats.

The error into which the majority falls is to believe that one can identify threatening language regardless of the circumstances in which the language is used and regardless of the ears to which it is directed. A dictionary definition will suffice because it makes no difference whether the words are addressed to a judge or to a machine hand, they must mean the same thing.

It is astonishing to find that the ears of employees are so exquisitely attuned to every nuance of meaning in the employer's letters and speeches, but that when it comes to the union's representations these same employees are "ordinary working people unversed in the 'witty

diversities' of labor law," NLRB v. S. E. Nichols Co., 380 F.2d 438, 442 (2d Cir. 1967), so dull and stupid that the union can easily pull the wool over their eyes. Employees who have not the slightest difficulty in distinguishing between a "prediction" and a "threat", are unable to read union authorization cards with even that degree of understanding which human beings ordinarily exercise. Surely enforcement of the Board's orders has not become a game of "Heads I win, tails you lose."

The extent to which the majority will go in defending the employer's rights is indicated by their treatment of the employer's threats to discontinue making "special personal arrangement[s]" and granting privileges "such as time off when your children [are] sick, weddings, for haircuts, a school prom, emergencies at home, and to catch up on studies." These "fears" (of the employer!) may have been "unwarranted" says the majority, but "they were not shown" to be unreasonable. If it is not obvious on its face that no employee would believe that the *union* would interfere with his taking time off for a haircut, and that the employees undoubtedly (and correctly) understood that it was the *employer* who was going to withdraw these privileges, then certainly such a matter ought to be left to the Board's expertise, without requiring a "showing" that the Board was right.

In the amusing pursuit of second-guessing the Board as to the intent with which each of the employees signed a union authorization card, my brothers find that the cards of Carbone and Zielnicki should not be counted toward a union majority. There is nothing whatever in the evidence as to Carbone which would justify the conclusion that she was misled into "the belief that the union would not become [her] representative unless it won an election." The testimony as to Carbone's signing is as follows:

"Trial Examiner: Whatever conversations you engaged with them about signing the card. Now whatever you recall.

A. When they came to the house they told me they were going to try to get the union into the market and they claimed if we have a union we would have our seniority rights if we left the place and went back. They claimed hospitalization and retirement plans and they asked me if I wanted to sign a card and I said yes.

Q. Was there anything said about the right to vote?

\* \* \* \* \* \*

A. Yes.

Q. What did they say? A. They said if they got enough people they would have a vote and the union in.

Q. Do you mean election, did they mention the word election?

\* \* \* \* \* \*

A. I don't remember.

Q. Was there anything further said beside what you told us? A. No."

It seems to me to be obvious from the testimony that Carbone signed because she wanted improved conditions, not because she wanted an election. That there could be an election was neither untrue nor misleading.

As to Zielnicki there was some talk about an election at the time he signed his authorization card, but what was said did not, as I see it, amount to a misrepresentation. Moreover the signature was sought by a fellow-employee rather than by a union representative. Finally I cannot understand why my brothers think it of no moment that Zielnicki signed the card *before* the so-called misrepresentations were made. Surely their whole argument must rest on the ground that the card was signed as a *result* of the misrepresentation.

This is one more case in which an employer is allowed to succeed by unfair labor practices in depriving his employees of the right to union representa-

tion. By such decisions the courts nullify the beneficent purposes for which Congress adopted the National Labor Relations Act.