380 F.2d 438
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
S. E. NICHOLS COMPANY, Nichols Discount City, Butlers' Shoe Corporation, the Richards Corporation, Barbara Lynn Stores, Inc., P. H. S. of Elmira, Respondents.
 No. 395.
 Docket 30961.
 United States Court of Appeals Second Circuit.
 Argued May 1, 1967.
 Decided June 21, 1967.
 
 Paul J. Spielberg, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, William J. Avrutis, Washington, D. C., Attorney), for petitioner.
 James L. Burke, Elmira, N. Y., for respondents.
 Before WATERMAN, FRIENDLY and FEINBERG, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 S. E. Nichols Company through its subsidiary Nichols Discount City operates a retail store in Elmira, N. Y. Four departments are leased to licensees; while the licenses provide that each licensee shall hire its employees at its own expense, they contain provisions for Nichols' control of wages, fringe benefits and other matters as well as a right to dismiss any employee and to intervene in any of the licensees' labor disputes. This, along with evidence that all employees were treated as a single group, justified the Board in finding that Nichols, Discount City and the licensees were joint employers and all store employees were a single unit.
 
 
 2
 Local 1687, Retail Clerks International Association, AFL-CIO ("the Union") began to organize the employees in November, 1964. Its efforts came to the attention of Bambrick, the store manager, early in December. He held a meeting on December 12 at which he told the employees that he did not think they needed a union; that their existing benefits were as much as the Union could get for them; that if he found any Union organizer in the store talking to an employee, he would eject both; and that he knew who the employee was who would run to the telephone and tell the Union what he had said. On December 18 the Union sent Bambrick a telegram reciting that it represented a majority in a described unit, requesting that its authorization cards be submitted to an impartial and disinterested person on December 22 for the purpose of verifying its majority status, and demanding that consequent on such verification the company begin negotiations on December 31. Receiving no answer the Union's business agent telephoned Bambrick on December 21 and asked, "Can we sit down and talk?" Bambrick answered, "I do not have the power or the authority to talk to you," and added that the matter "is in the hands of our attorney," whom he named.
 
 
 3
 The next day, Brecker, Nichols' vice-president and personnel manager from New York City, appeared at the store. At meetings on that and the following day he asked whether the employees had any complaints. They did. One employee had not received the automatic pay raise due him under the terms of the store's Employee Handbook; two others had not been compensated for unused sick leave as the Handbook provided; still others complained of the condition of the toilets and the employees' room. Brecker advised that the complaints would be satisfied, encouraged the employees to bring their grievances to the attention of management, offered in response to an inquiry to ask Blue Cross to contact the employees about group medical insurance although at their own expense, and said the company would see to it that there would be an election to determine their desires to have a union. On January 2, 1965, Bambrick conducted another meeting. He stated that the new smocks and the new furniture for the employees' room requested by the workers would be provided, that raises would be paid those entitled to them, and, again, that a representative of Blue Cross would be in touch with them although still on the basis of a plan financed solely by the employees. Some employees asked for a ten-minute "break" in their five-hour Saturday night shift; this was granted, with the admonition, "Don't misuse it, because if you do, I will take it away from you." Brecker was back for more meetings on January 7, some also attended by Keller, a general supervisor from New York City. Further assurance about the smocks was extended. The employees were told they had a right to have a union but the company wanted an election by secret ballot to determine their desires. Brecker said that the employees had a right to sign affidavits for the Union and the company would not hold their signing against them; also that he knew of Union meetings at the Eagle Club at which the union organizers had had their ears pinned back. The General Counsel established that 11 employees were compensated for unused sick leave at the end of December and a substantial number received small wage increases which were neither automatic nor required by the New York Minimum Wage Act, but which Nichols says were necessary to maintain wage differentials after the increase in the state minimum wage.
 
 
 4
 
 Section 8(a) (1).
 
 
 
 5
 The trial examiner found and the Board agreed that this record warranted findings of a plan "which was reasonably calculated to influence employees in the exercise of their statutory rights through the granting or promising of economic benefits, and to undermine the Union in violation of Section 8(a) (1) of the Act"; that Bambrick's statements that he knew the identity of the employees who would telephone the Union and Brecker's about the meetings at the Eagle Club "created an impression which was conveyed to the employees that their union activities were being kept under surveillance" in violation of § 8(a) (1); that Bambrick's statement that he would eject from the store any employee who was found talking to a union organizer, not being limited to selling areas or working hours, was a further violation; and so was Brecker's request that employees bring their grievances directly to the attention of management, "especially since at that time, as appears infra, the Union represented a majority of the employees at the Store, and had requested recognition and bargaining."
 
 
 6
 We suppose the Board was warranted in finding that the provision of increased economic benefits violated § 8 (a) (1) under NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed. 2d 435 (1964), although in contrast to the examiner's portentous description the violation to our minds comes close to being de minimis. See Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 112-116 (1964). We likewise sustain the finding as to the ejection threat, which is carried into the order only in a prohibition of threatening economic reprisals against employees found talking to union organizers during non-working hours and in non-selling areas. The two incidents relied upon to prove that Nichols created an impression of unlawful surveillance show little more than that it had some source of information about union activities; there was nothing to indicate it had stimulated the making of such reports, as in Edward Fields, Inc. v. NLRB, 325 F.2d 754, 759 (2 Cir. 1963), and NLRB v. S. & H. Grossinger's, Inc., 372 F.2d 26, 28 (2 Cir. 1967), or that the employees would have had any reason to think it had. However, since Nichols' brief has not raised the issue whether this is enough to support the order as to creating an impression of surveillance, we find it unnecessary to decide what the result would have been if it had, and grant enforcement. On the other hand, the portion of the order prohibiting respondents from "dealing directly with their employees with respect to their grievances or conditions of employment," because it was predicated on the finding of majority status, must fall along with that, as to which see infra.
 
 
 7
 
 Section 8(a) (5).
 
 
 
 8
 We do not read the Trial Examiner's report, which the Board adopted, as basing the bargaining order on the § 8(a) (1) violations and, with these of so low an order of magnitude, we would not uphold it if in fact it proceeded on that ground. NLRB v. Flomatic Corporation, 347 F.2d 74, 77 (2 Cir. 1965). The finding rather was that the Union had achieved majority status and that Nichols violated § 8(a) (5) by failing to recognize it and dealing directly with the employees. We might well agree that if a majority had been obtained, the evidence sufficiently negated the existence of good faith doubt within the teaching of the case law;[1] Nichols made no inquiry as to the validity of the Union's representations,[2] did not dispute its assertion of majority status, and acted as if this had never been advanced. On the other hand, lack of good faith doubt is immaterial if in fact no majority existed.
 
 
 9
 It was stipulated that the bargaining unit consisted of 93 employees. The authorization cards were in a form reproduced in the margin.[3] General Counsel submitted 50 signed cards, but the Board eliminated one as obtained by a misrepresentation that 75 percent of the employees had signed and another on the basis that the employee had sought its return before any misconduct by respondents and the Union's demand for recognition. This left 48, giving the Union a majority of two.
 
 
 10
 The Board makes much of the supposed clarity of the cards used by the Union in this case,[4] in contrast to the deceptive or ambiguous ones in other instances where it nevertheless upheld the union, e. g., Lenz Co., 153 N.L.R.B. 1399 (1965); Winn-Dixie Stores, Inc., 143 N.L.R.B. 848, 851 n. 9 (1963), enforced NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750 (6 Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965); and S. N. C. Mfg. Co., 147 N.L.R.B. 809 (1964), enforced, NLRB v. S. N. C. Mfg. Co., 122 U.S.App.D.C. 145, 352 F. 2d 361, cert. denied 382 U.S. 902, 86 S.Ct. 235, 15 L.Ed.2d 155 (1965). But while clarity should constitute the beginning of any effort to show a majority on the basis of authorization cards, it is not the end; the clearest written words can be perverted by oral misrepresentations, especially to ordinary working people unversed in the "witty diversities" of labor law. It is all too easy for the Board or a reviewing court to fall into the error of thinking that language clear to them was equally clear to employees previously unexposed to labor relations matters; to treat authorization cards, which union organizers present for filling out and signing and then immediately take away, as if they were wills or contracts carefully explained by a lawyer to his client is to substitute form for reality. The very argument by which the Board has upheld unions even when the cards were deceptively worded, namely, of placing "more emphasis upon the representations made to the employees at the time the cards were signed than upon the language set forth in the cards," NLRB v. Winn-Dixie Stores, Inc., supra, 341 F.2d at 754, works against it here. In our view the evidence demands a conclusion that at least three of the signers were induced to affix their signatures by statements causing them to believe that the union would not achieve representative status without an election.
 
 
 11
 Elaine Morgan testified the union representative had informed her that there would have to be an election and if she wanted to change her mind, she could. Cross-examination by the General Counsel and the Union's lawyer failed to shake her, and the Union representative, Gilbert, confessed inability to give an accurate account of this interview. At the argument before us Board counsel in effect conceded that Mrs. Morgan's card should not be counted.
 
 
 12
 Virginia Marks swore that Ripley, the organizer who approached her, said he was soliciting cards "for the purpose of representing the union, to petition the NLRB in Washington as representative of the employees at Nichols to investigate the labor conditions in the store, and that if I signed the card I would not be joining the union." Also that "in order to get the union in the store an election would have to be held in the store." On cross-examination she denied that Ripley told her that on obtaining cards from more than 51% of the employees the union would demand that the company sign a contract; indeed counsel suffered the blow not infrequently experienced by cross-examiners when Mrs. Marks expanded on her direct testimony by saying that Ripley "explained that it [the card] was nothing more than just a means to have an investigation of the labor conditions, that obligated me neither way, one way nor the other, to the union, that it was just a means that they used to have the store investigated and labor conditions and so forth investigated. And it was the only way there could be an election held in the store." The best that further cross-examination could elicit was an admission that something was said about asking the company to bargain if the union got a majority but she couldn't remember what. Ripley conceded that when he handed the card to Mrs. Marks, she asked if it was for an election; he claimed he told her it was "not necessarily for an election, that it could be for an election if we couldn't reach a majority status to make our demand for recognition upon the company." This discourse was a long way from making plain to Mrs. Marks that if a majority was achieved, the Union might assert it had become the employees' exclusive bargaining agent without an election. The trial examiner did not discredit Mrs. Marks' testimony but, because he thought it to be "confused and conflicting," found it "insufficient to overcome the effect of her overt action in having filled out and signed the card." The testimony is clear enough to us; housewives working as salesladies in discount stores are not to be charged with the learning of the Labor Board's trial examiners.
 
 
 13
 Esther Conklin's testimony was even more vivid. She said Ripley told her "that he needed a certain percentage of signatures before he could go to, like, the Government, I guess, and get a statement for a vote to put the union into a store. And then he told me about that there would be a voting booth put in the front of the store and you could go up and vote a secret ballot as you wanted to vote. And that is about it." Under cross-examination she agreed Ripley had also "said if they got a certain percentage of cards they could send a telegram" to Nichols, but that this would say "that he had just — had gotten a certain percentage and he was going to file for, you know, send the cards, and have them okayed for a vote." In response to the General Counsel's further interrogation she could not recall Ripley's telling her that the card could be used for any purpose other than to obtain an election. The trial examiner nevertheless found her card valid on the basis that she did not claim to have been told the sole purpose of the card was to secure an election and that her testimony did not "overcome the effect of her overt action in having filled out and signed the card." Any fair view of the record shows that Mrs. Conklin was induced to sign the card by the representation that the union needed her signature to secure an election and never understood she was taking it on as her representative without one.
 
 
 14
 There are two other cases — Monica Matuszak and Elizabeth Frank — where if one looked at their testimony alone, it would seem evident they entertained no thought of having irrevocably authorized the union to represent them once a majority had signed cards. However, the trial examiner chose to credit the contrary testimony of the union organizers, whose detailed memory of their many interviews in this campaign of several months past was indeed remarkable.
 
 
 15
 There is some disagreement among the courts of appeals as to the effect of union tactics of the sort here described. The decisive question is whether the employees "meant to make the Union their representative" or instead "understood the cards not to be votes for the Union" but rather requests "that an election should be called at which they would vote for or against the Union as they then pleased." NLRB v. Stow Mfg. Co., 217 F.2d 900, 902 (2 Cir. 1954) (L. Hand., J.), cert. denied, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955). The disagreement concerns the extent to which the Board may consider the authorization printed on the card, often in legal language employees cannot understand, to be nearly conclusive evidence of the signers' intent in the face of oral representations that the purpose of the card is to secure an election. The Sixth and Seventh Circuits have followed the Board's position that authorization cards which in terms confer bargaining authority can be invalidated only by proof that signatures were obtained by a misrepresentation that the sole purpose of the cards was to obtain an election. NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6 Cir. 1965); Happach v. NLRB, 353 F. 2d 629 (7 Cir. 1965). See also Amalgamated Clothing Workers of America, AFL-CIO v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898, 906-907 (D.C. Cir. 1966) (dictum).[5] The Fifth Circuit and, as that Circuit reads its opinion, the Eighth hold such cards invalid if the employees were led to believe that the union would attain representative status only by winning an election even though they were also told the cards might be shown to the employer. Engineers & Fabricators, Inc. v. NLRB, 376 F.2d 482 (5 Cir. 1967); Bauer Welding & Metal Fabricators, Inc. v. NLRB, 358 F.2d 766 (8 Cir. 1966). Compare NLRB v. Peterson Bros., Inc., 342 F.2d 221 (5 Cir. 1965), and Amalgamated Clothing Workers, supra, 365 F.2d at 907-908, invalidating "ambiguous" cards where the employees were told their function was to secure an election.
 
 
 16
 The Board contends we are committed to the Sixth and Seventh Circuit view by NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684, 686-687 (2 Cir. 1966), but we do not read it as going so far. In upholding the bargaining order in that case the opinion stressed the explanation of union representatives to the employees at meetings that once a majority had signed cards, "the union would request collective bargaining"; "you send a letter to the Company and tell them this is the number of people that want the Union. If the Company agrees, you have your Union in. If they don't, then you have to have an election."[6] While this was not a full and fair explanation, it was a far less serious misrepresentation than those here, which gave employees the impression that they would have a right to vote under all circumstances even though the union attained a card majority. Employees like those in Gotham who were willing to be represented by a union if the employer acquiesced on a showing of a majority might well not cavil over the union's being able to force recognition without an election if the employer did not. It is quite a different matter to permit a union to attain recognition by authorization cards procured on the affirmative assurance that there would be an election without a further clear explanation that the cards can and may also be used to obtain recognition without any subsequent expression of preference by the employees; such a half-truth gives the employees the false impression that they will have an opportunity in all events to register their true preferences in the secrecy of the voting booth. As has been well said, Note, supra, 75 Yale L.J. at 826:
 
 
 17
 "If the employee thinks the cards will lead to a secret ballot, he can insure himself against the possibility of future retaliation and prevent harassment only by signing. Such an employee may sign a card planning to vote against the union or at least intending to reserve decision until he hears the employer's views or talks to fellow employees."[7]
 
 
 18
 We decline to encourage such an impairment of employees' § 7 rights.[8] It goes without saying that our refusal to enforce the bargaining order does not preclude the Board's directing an election upon the Union's request.
 
 
 19
 Enforcement granted in part and denied in part.
 
 
 
 Notes:
 
 
 [1]
 The teaching is criticized in an able note, Union Authorization Cards, 75 Yale L.J. 805, 828-831 (1966), which concludes that "if for no other reason than this proven unreliability of cards as a medium for registering employee choice, an employer would appear always to have grounds for a good faith doubt of majority status." For a suggestion that the Board itself is now taking a somewhat more generous attitude to good faith doubt, see Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851, 852-855 (1967), and the cases there cited
 The Yale note also makes a forceful argument that the Taft-Hartley Act intended to make a secret ballot the exclusive procedure for selecting bargaining representatives and that the courts of appeals have erred in regarding pre-1947 authority, notably Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), as determinative to the contrary. While the brief discussion in UMW of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 71-72, 76 S.Ct. 559, 100 L.Ed. 941 (1956), would hardly preclude Supreme Court reexamination of this issue, the statement in the UMW opinion and the consistent course of decision in the courts of appeals prevent our doing so. The cases do make abundantly clear that the authorization card procedure is a fertile breeder of long records, with sharp conflicts of testimony as to what was said to each of many employees that are almost impossible to resolve.
 
 
 [2]
 In mentioning this we are fully aware of the dilemma with which the employer is confronted. If he does not question his employees as to the union's solicitation practices, he will be charged with lack of good faith doubt; if he does, he is likely to find himself charged with unlawful interrogation under § 8(a) (1) and ultimately on the receiving end of a bargaining order. See Judge Brown's vivid description in NLRB v. Dan River Mills, Inc., 274 F.2d 381, 388-389 (5 Cir. 1960)
 
 
 [3]
 
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 [4]
 In fact the cards, unlike those in Engineers & Fabricators, Inc. v. NLRB, 376 F.2d 482 (5 Cir. 1967), and in NLRB v. Koehler, 328 F.2d 770, 771-772 (7 Cir. 1964), where enforcement of a bargaining order was nevertheless refused, did not contain an acceptance of union membership, one thing an employee would readily understand. Bearing in mind that the function of authorization cards used as a basis for creating a duty in the employer to recognize the union is to demonstrate that a majority of the employees have "clearly manifested an intention to designate the Union as their bargaining representative." Englewood Lumber Co., 130 N.L.R.B. 394, 395 (1961), quoted with approval in, e. g., NLRB v. Koehler, supra, 328 F.2d at 772; Bauer Welding & Metal Fabricators Inc. v. NLRB, 358 F.2d 766, 776 (3 Cir. 1966); and Engineers & Fabricators, Inc. v. NLRB, supra, 376 F.2d at 487, there seems to be no reason why cards could not state in large type that if a majority signed, the union would claim representative status without an election. See Lesnick, supra, 65 Mich.L. Rev. at 856-858
 
 
 [5]
 TheCumberland rule is criticized in Comment, Refusal-To-Recognize Charges under Section 8(a) (5) of the NLRA; Card Checks and Employee Free Choice, 33 U.Chi.L.Rev. 387, 392-397 (1966), and in the Yale Law Journal note, supra note 1, 75 Yale L.J. at 824-828.
 
 
 [6]
 The majority required inGotham was 52, and 48 cards were uncontested on the ground here considered. Of the 18 signers whose cards were so contested, 11 had attended the union meetings; three of these were members of the union committee and another was one of the employees who had asked the union to mount the organizing campaign.
 
 
 [7]
 A footnote to this passage quotes the AFL-CIO Guidebook for Union Organizers (1961): "N. L. R. B. pledge cards are at best a signifying of intention at a given moment. Sometimes they are signed to `get the union off my back.'"
 
 
 [8]
 Our decisions in NLRB v. Divigard Baking Co., 367 F.2d 389 (2 Cir. 1966), and NLRB v. Niskayuna Consumers Cooperative, Inc., 376 F.2d 260 (2 Cir. 1966), are not to the contrary. InDivigard, where 8 out of 10 employees had signed cards, four did this at a union meeting where they were expressly told that the cards authorized the union to represent the employees or to bargain for them as well as to obtain an election, two others who testified an election was mentioned were also told that the card would authorize the union to represent them, and the testimony of the remaining two was inconclusive. In Niskayuna three cards were contested on the ground of misrepresentation but there was no credible evidence that the signers had been told that union representation would hinge on an election.