**BRYANT CHUCKING GRINDER COM-
PANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 25, Docket 30844.

United States Court of Appeals
Second Circuit.

Argued Oct. 2, 1967.

Decided Dec. 12, 1967.

Anderson, Circuit Judge, dissented. as to the propriety of the enforcement of the bargaining order.

Kenneth C. McGuiness, Washington, D. C. (Vedder, Price, Kaufman, Kammholz & McGuiness, Washington, D. C., on the brief), for petitioner.

George B. Driesen, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Peter Ames Eveleth, Washington, D. C., Atty., on the brief), for respondent.

Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.

HAYS, Circuit Judge:

Petitioner asks us to review and set aside an order of the National Labor Relations Board based upon a finding that petitioner violated Section 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (a) (5).[1] The Board seeks enforcement. We deny the petition and enforce the order.

The Board held that petitioner violated Section 8(a) (1) of the Act by threatening employees, by granting benefits to discourage joining the union, by coercive interrogation and by encouraging employees not to cooperate with the Board in the investigation of unfair labor practices. The Board held that petitioner violated Section 8(a) (5) and (1) by refusing to recognize and bargain with the union.

The union involved is the United Electrical, Radio and Machine Workers of America (UE) Local 218. The plant of the employer at which the unfair labor practices occurred is located in Springfield, Vermont.

In May 1962 the union undertook a campaign to organize petitioner's employees. By August 14 the union had authorization cards from 198 of petitioner's 337 bargaining unit employees. On that date the union notified the employer by letter that it represented a majority of the employees and asked for a bargaining meeting. The petitioner replied to the union's letter declining to meet with the union and stating the company's "very definite policy" of refusing recognition in the absence of Board certifica-

---

1. (a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

* * * * *

    (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

tion. The employer then began a campaign of vigorous opposition to the union, carried on largely by letters and notices to the employees. In the meantime the union had filed a representation petition with the Board.

### Interrogation

■ A number of employees were questioned by supervisory officials as to their attitude toward the union. The Board could properly find that this interrogation was coercive since it took place in an atmosphere of active opposition to the union, Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964), without explanation to the employees of the purpose of the questioning and under circumstances indicating that it had no legitimate purpose, Edward Fields, Inc. v. NLRB, 325 F.2d 754, 758–759 (2d Cir. 1963) and was unaccompanied by any assurance against reprisals, see NLRB v. Lorben Corporation, 345 F.2d 346, 348 (2d Cir. 1965). Numerous instances of questioning involved particularly threatening connotations because employees were interrogated in connection with interviews concerning eligibility for merit increases.

### Threats

■ There was substantial evidence to support the Board's finding that the employer threatened employees with reprisals. Questioning of employees as to union activity in connection with discussion of merit increases, referred to above under "Interrogation" could well have been considered by the employees to carry with it the implication that those who favored the union would not receive an increase. One of the supervisors, when he learned that an employee was a member of the union organizing committee asked him, "Do you like your job?" On another occasion a supervisor told an employee that if the union won he could not be transferred from one job to another when work was slack but would be sent home.

### Benefits

■ During the period prior to the representation election the employer announced an increase in pension benefits. The announcement was coupled in an advertisement published in the local newspaper and in a notice sent to employees with material urging employees to vote against the union. The Board could properly hold that this promise of benefit was a violation of Section 8(a) (1). NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); NLRB v. D'Armigene, Inc., 353 F.2d 406, 408 (2d Cir. 1965).

### Dissuading employees from cooperation with the Board

■ We are agreed that the Board could properly find that the employer violated the Act by posting a notice to employees stating that they were under no obligation to assist the Board in connection with its investigation of unfair labor practice charges, and that they did not "have to talk with these people." This notice accompanied by the employer's assurance that it would resist the Board's efforts "with every force available to free men," constituted an unjustified obstruction of the Board's processes. See Henry I. Siegel Co. v. NLRB, 328 F.2d 25, 27 (2d Cir. 1964).

A majority of the court believes that the Board's finding of violation in the employer's reinterviewing the employees who testified at the Labor Board hearing between their direct and cross-examination was unjustified. This determination requires no modification of the Board's order.

### Refusal to Bargain

■ The Board's finding that on August 14, 1962 when the union wrote to the employer to request bargaining, the union had a majority of the employees is supported by substantial evidence in the record. See NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2d Cir. 1966).

The authorization cards signed by the employees were free from ambiguity.[2] The evidence credited by the Board, and therefore accepted by us, see NLRB v. Warrensburg Board & Paper Corporation, 340 F.2d 920, 922 (2d Cir. 1965), established that the union's organizers made no misrepresentations to the employees as to the purpose of the cards and the effect of their signatures. Indeed the record shows that a representative of the union correctly explained to the employees at the first organizational meeting the methods by which recognition could be attained and at no time were the employees told that the sole purpose of signing the cards was to secure an election. See NLRB v. Gotham Shoe Mfg. Co., supra; NLRB v. S. E. Nichols Company, 380 F.2d 438, 444–445 (2d Cir. 1967).

■ There is also adequate support for the Board's conclusion that the employer did not have a good faith doubt of the union's majority status. Not only did the employer not suggest a card check but it rejected the possibility that such a verification would be acceptable by announcing its "very definite policy" of refusing any evidence of representational rights other than a Board certification.

■ The history of violations of Section 8(a) (1) is sufficient to establish that the employer deliberately destroyed the union's majority and the Board's order to bargain is an appropriate method of correcting this default. Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944); NLRB v. International Union, Progressive Mine Workers, 375 U.S. 396, 84 S.Ct. 453, 11 L.Ed.2d 412 (1964) (reversing per curiam 319 F.2d 428 (7th Cir. 1963) which directed an election because such a long period of time had passed since the union had attained its majority status).

### The General Counsel's Delay in Issuing the Complaint

■ The General Counsel delayed issuing the complaint for about 15 months while awaiting a Board decision clarifying the rule as to sustaining Section 8(a) (5) charges where the union has participated in an election and lost. Mere delay in the issuance of the complaint is insufficient ground for the denial of relief.

"The company urges that, because of the lapse of time between the occurrence of the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should be either denied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. Franks Bros. Co. v. National Labor Relations Board, 321 U.S. 702 [64 S.Ct. 817, 88 L.Ed. 1020]; National Labor Relations Board v. P. Lorillard Co., 314 U.S. 512 [62 S.Ct. 397, 86 L.Ed. 380]; National Labor Relations Board v. Mexia Textile Mills, Inc., 339 U.S. 563, 568 [70 S.Ct. 826, 829, 833, 94 L.Ed. 1067]. Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)." NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230(1962).

We have examined the other points made by the petitioner and find them to be without merit.

Petition denied. Order enforced.

FRIENDLY, Circuit Judge (concurring in the result):

This case does not have the simplicity for me that it does for my brother Hays. Being asked to enforce an order requiring recognition of a union more than

---

2. I hereby request and accept membership in the above named union, and authorize it to represent me, and in my behalf to negotiate and conclude all agreements as to hours of labor, wages, and all other conditions of employment.

five years after the organizing campaign is enough in itself to arouse serious qualms. These are compounded by the circumstances that the inordinate delay was almost wholly attributable to the Board—more than 15 months of it a deliberate one by the General Counsel; that the union's card-count majority was small and doubtful on any view; that there has been a considerable turnover in the employees; and that nothing now stands in the way of a fair election. If we were free to decide the case in accordance with our own notions of good sense, I would unhesitatingly join my brother Anderson in denying enforcement of the bargaining order. But I cannot find sufficient legal basis for refusing to grant enforcement, distasteful though that is.

The two most important objections to enforcement of the bargaining order are the arguments that the union lacked a valid majority [1] and that even if it did, the order is an inappropriate remedy under the peculiar circumstances.

In NLRB v. S. E. Nichols Co., 380 F.2d 438, 441–445 (2 Cir. 1967), we rejected the rule announced by the Board in Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963), enforced 351 F.2d 917 (6 Cir. 1965), that an authorization card "clear" on its face could be invalidated for misrepresentations as to its purpose only by proof that the solicitor had said that the "sole" purpose of the card was to secure an NLRB conducted election; we held that cards were invalid if "signers were induced to affix their signatures by statements causing them to believe that the union would not achieve representative status without an election." Our decision has already become the subject of consideration by the Sixth Circuit, NLRB v. Swan Super Cleaners, 384

F.2d 609 (1967), and the District of Columbia Circuit, Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers v. NLRB (Preston Products Co.), (1967). The Sixth Circuit, which we had thought, 380 F.2d at 444, committed to the Board's narrow Cumberland rule, now has disclaimed any such commitment, declaring that "whatever the style or actual words of the solicitation, if it is clearly calculated to create in the mind of the one solicited a belief that the *only purpose of the card is to obtain an election,*" the card is invalid. The difference between this and our formulation is inconsequential in most instances, as evidenced by the Sixth Circuit's apparent agreement with the result we reached in *Nichols.* On the other hand, a divided court in the District of Columbia Circuit has adhered to the Board's *Cumberland* rule which makes everything turn on the *solicitor's* use of "only" or a synonym.

The *Preston* opinion does not explain why misrepresentations to employees that card signatures will not suffice to require the employer to grant the union a seat at the bargaining table as their exclusive agent should be disregarded unless the solicitor can be proved to have said *in ipsissimis verbis* that the sole purpose of the cards is to procure an election. As Judge O'Sullivan aptly wrote in Swan Super Cleaners, Inc., supra, 384 F.2d at 620, "A sophisticated and only modestly talented union agent could easily live with such a narrow rule and, leaving out the *bad words*—'sole' and 'only'—employ language clearly calculated to lead a woman laundry worker to believe that the holding of an election was all that she signed up for." [2] While the *Preston* opinion ex-

---

1. While I agree with Judge Hays that General Counsel sustained his burden of negating good faith doubt, I do this solely on the basis of Bryant's adamant position that it would not recognize a union without Board certification, and dissociate myself from what is said as to the bearing of its rejection of a card check and of its violations of § 8(a)(1). See NLRB v. River Togs, Inc., 382 F.2d 198,

206–207 (2 Cir. 1967); Textile Workers Union of America v. NLRB, 380 F.2d 292 (2 Cir. 1967).

2. "A sophisticated and only modestly talented union agent" could still more easily conform his testimony to the "sole purpose" standard, even without conscious prevarication. While it is true, as emphasized by Judge Wright in *Preston,* that the evidence of "employees testify-

presses concern that a contrary course "would require us to examine all relevant testimony in detail, to adjudge the credibility of each witness, and to weigh the evidence," this could hardly have meant that the *Cumberland* rule avoids these tasks; it simply narrows the scope of inquiry to whether the solicitor used a particular form of words. Furthermore, as the court was of course aware, judges reviewing agency action do not "adjudge the credibility of each witness" or "weigh the evidence." While ease of review is indeed desirable, this can never justify narrowing the inquiry to eliminate relevant facts; here, as in NLRB v. United Steelworkers of America, 357 U.S. 357, 364, 78 S.Ct. 1268, 1272, 2 L.Ed.2d 1383 (1958), mechanical answers will not "avail for the solution of this non-mechanical, complex problem in labor-management relations." The extensive discussion of evidence in such cases as *Nichols* and *Swan Super Cleaners* was necessitated by the Board's use of the wrong standard and the courts' desire to avoid a time consuming remand; once the Board adopts the proper standard, judicial review under *Nichols* or *Swan Super Cleaners* should not be substantially more difficult than under the District of Columbia rule. Moreover, the supposed administrative advantage of the latter largely vanishes in light of the court's appropriate concession that the simplistic *Cumberland* rule would be inapplicable if the evidence revealed "gross misstatement as to the union's intention with respect to an election," and that *"Cumberland* does not articulate an absolute rule, but rather a useful and well founded rule of thumb." What would truly ease the administrative problem both for the Board [3] and for the courts would be for the Board to use its long neglected rule-making power [4] and specify what a union authorization card should say and how.

I agree with Judge Anderson that a considerable number of cards must be invalidated for proven misrepresentations by solicitors [5] but that this still leaves

ing under the eye of the company officials," is somewhat suspect, there is no reason to suppose the testimony of union organizers is any less so. So far as memory is concerned, an employee would seem rather more likely to be able to recall what was said to him than an organizer would be to remember what he said to each of scores of employees in many campaigns ranging over months, or, as here, years.

3. The percentage of unfair labor practice charges filed against employers containing § 8(a) (5) allegations has risen from 28.5% in the year ended June 30, 1964, when Bernel Foam Products Co., Inc., 146 N.L.R.B. 1277, was decided, to 35.0% in the year ended June 30, 1966, and the General Counsel has reported that over 40% of the hearings held during fiscal 1966 involved § 8(a) (5), 64 LRRM 181, 191. See Suggested Changes in NLRB Labor Relations Board Procedures, Report of Committee on Labor and Social Security Legislation of Ass'n of the Bar of the City of New York, Table D (1967). The General Counsel has pointed out that cases like the present "normally involve complex fact and legal issues and require more Regional Office time and manpower to investigate and process." 64 LRRM 181, 186.

4. See International Union of Operating Engineers, Local 49 v. NLRB, 122 U.S. App.D.C. 314, 353 F.2d 852, 856 (1965); Peck, The Atrophied Rule-Making Powers of the NLRB, 70 Yale L.J. 729 (1961); 16 Admin.L.Rev. 77 (1964); 1 Davis, Administrative Law Treatise § 6.13, pp. 147–50 (1965 pocket part).

5. The testimony given by employee Broderick, after the Board had reversed the Trial Examiner's ruling which had forbidden inquiry into the circumstances of the signatures, illustrates the morass of confusion produced by the authorization card procedure as now sanctioned:

"Q. (By Mr. McGuiness, Company Counsel) Would you please tell us in your own words the circumstances surrounding the signing of the card, including what was said at that time? A. Well, I was offered a card and asked if I would sign up, sign a card. The reason was that if they had enough cards in, there would be a union election to form a union. So I did.

\* \* \* \* \*

Q. Now, do I understand your testimony to be, Mr. Broderick, that there was general talk in the plant about the purpose of signing the cards? A. Yes, the purpose that I mentioned; I thought I mentioned that if we were

the Union with a majority. Where I am unable to follow him is in his view that other circumstances cast on the General Counsel a burden that would not otherwise have existed. The August 3 handbill was indeed misleading; while it stated "your card is your written pledge that you want UE Local 218 at Bryant," this was followed immediately by lan-guage indicating that the card was simply a pledge to vote for Local 218 at an election. However, the joint appendix does not inform us how many cards were signed in reliance on the handbill; the signing had begun at the end of May and the Board credited testimony of the chief organizer that he had explained at meetings from the outset that if the

to have enough cards in, it would call for an election.

Mr. McGuiness: The following questions are for the purpose of making an offer of proof.

Q. (By Mr. McGuiness) What was your understanding then of the effect of the signing of the card, Mr. Broderick? A. What was my understanding?

Q. Yes. A. You mean my own understanding?

Q. Yes, your personal understanding of what the card meant. A. To form a union.

\* \* \* \* \*

Q. (By Mr. McGuiness) Was it your understanding, Mr. Broderick, that the card could be used to establish a union in the plant without an election? A. My understanding? No, sir. My understanding was that we had to have the majority of cards for the union to win.

Q. Well, did you understand there was to be an election or not from the cards? A. Yes, if there was enough signed cards placed there, they would hold an election.

\* \* \* \* \*

Q. (By Mr. Panos, for General Counsel) Mr. Broderick, I believe you testified you don't recall who it was that said to you something prior to your signing your card? A. No, I don't recall who it was, no.

Q. And would you tell us again what was said to you, if anything? A. Yes, if I can recall. It was that if there was enough signed cards, enough fellows their [sic] signed cards, it could hold an election.

\* \* \* \* \*

Q. Were you ever told that one of the purposes of signing the card was to show your support for the union? A. Well, I was asked to sign the card to support the union and I did it. That is the best way I can explain it to you.

Q. Sir? A. I did sign the card to support the union. I don't know whether those same words were ever put to me or not.

\* \* \* \* \*

Trial Examiner: Let me follow up with a question. You said you don't know whether those words were put to you?

The Witness: Well, the only way I can explain it to you, I mean, if I signed the card, my idea in my own mind is I was supporting the union by signing the card. I agreed with it to sign the card to call for an election. I just figured—that is what I am trying to tell you. I must have known I was supporting the union.

Trial Examiner: You don't mean that anybody told you to sign the card in support of the union or anything to that effect?

The Witness: Well, I don't know. I don't think I had been told that. If I signed the card willingly, I must have —it must have been in my opinion that —that is the way I tried to explain it. I must have known what I was doing if I did sign it at that time.

\* \* \* \* \*

Q. (By Mr. Panos) Mr. Broderick, were you ever told that the only reason you should sign the card, single and only reason that you should sign the card, was in order to get an election? A. Well, I wasn't pointed out singularly; I think the way it was explained to me if we had enough cards in, we could hold an election.

Q. So, is it your testimony that signing the card, that one of the purposes of signing the card was to get an election? A. Yes, sir.

Q. And is it your testimony that by signing the card that getting an election was not the only purpose as was said to you, that it was not the only purpose? A. I don't know what you mean by that, sir.

Q. Well, you have told us that you were told that signing the card was to get an election, but that was not the only reason you were told that you should sign the card; is that correct? A. That is the only reason I was told. That is all I heard about it. You put a card in and you can hold an election if there are enough. \* \* \*"

Union achieved a majority status which the Company refused to recognize, the Union could file charges. We are pointed to no evidence that a particular solicitor had engaged in misrepresentation in so large a proportion of his solicitations as to require General Counsel to produce all his solicitees in order to avoid the otherwise reasonable inference of similar conduct. See NLRB v. Golub Corporation, 388 F.2d 921, 924 (2 Cir. 1967); Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L. Rev. 851, 857–58 (1967); cf. NLRB v. James Thompson & Co., 208 F.2d 743, 748 (2 Cir. 1953). Though there was a two-year lag between events and hearing, 15 months of which were attributable to the deliberate decision of the General Counsel, it is unclear how much the excess of this delay over the normal four or five months [6] added to Bryant's problems of proof, and Bryant's own conduct, as depicted in the portion of Judge Hays' opinion headed "Dissuading employees from cooperation with the Board," is subject to criticism.

While there is much force in Judge Anderson's position that even if the Union had a valid majority, a bargaining order is not an appropriate remedy under the unusual circumstances here presented, I find difficulty in believing the controlling decisions of the Supreme Court cited in both opinions leave us free to hold this. Franks Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), itself involved refusal to bargain with a union seeking initial recognition on the basis of a card count. While it may be distinguished since here the much longer delay was not "necessary *fairly* to determine the charges of unfair labor practices," Id. at 705, 64 S.Ct. at 819, (emphasis supplied), the Court's

latest expression on the subject, in NLRB v. Katz, 369 U.S. 736, 739, 748 fn. 16, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962),[7] was couched in terms so strong that to impose an exception requires more boldness than I possess.

I thus reluctantly concur in the enforcement of what seems to me an exceedingly ill-advised order.

ANDERSON, Circuit Judge (dissenting):

Under the peculiar circumstances of this case, I think a bargaining order, by imposing on petitioner's employees a form of representation concerning which a substantial majority has never had an opportunity to express a preference, disregards the employees' § 7 rights, and undermines the most fundamental policies of the Act. Accordingly I dissent from its enforcement, and would order that a new election be held.

The Union lost an election at Bryant in 1959. When it opened its organizing campaign at petitioner's plant in May of 1962, it immediately made known its purpose to sign up enough employees so that this time it would win the election. Many of the employees had experienced previous union campaigns at Bryant in 1956 and 1959, each of which had culminated in a Board-conducted secret ballot election. From the start there were clear indications that this drive would follow the same pattern, and the general talk around the plant was that there would have to be an election to determine the question of recognition.

The Union and its organizers were in no small part responsible for the general impression that the Union could not get in without first winning an election. The Trial Examiner found that Union leader Harley had "made it known that

---

6. See the report cited in note 4, Table G.

7. "The company urges that, because of the lapse of time between the occurrence of the unfair labor practices and the Board's final decision and order, and because the union was repudiated by the employees subsequently to the events recounted in this opinion, enforcement should be de-

nied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. The argument has no merit. Franks Bros. Co. v. NLRB * * *. Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)."

he contemplated that an election would have to be held in order to obtain recognition," and that there was talk of this at Union meetings and in conversations with individual employees. Although Harley testified that he had explained at one of the meetings all the ways in which the Union might gain recognition, whatever he said apparently made no lasting impression on the employees.[1]

The Union advertised that it needed enough signed authorization cards to petition the Board for an election, and that, by the beginning of August, it was making good progress in reaching this goal. Many of the employees who signed were expressly told at the time that the purpose of the card, which was of the standard variety used in these campaigns, was to bring about an election. Some were assured that they need not, therefore, pay any attention to what was printed on the face of the card. A few others were warned that if they did not sign a card at that time it would cost an extra $40 or $50 to join the union if it won the election. No one was told, on the other hand, that the Union might seek recognition on the basis of the cards alone, without first having a vote.[2]

On August 3 the Union distributed a handbill which was headed: "UE 218 ORGANIZATION FOR NLRB ELECTION MAKING GOOD PROGRESS." The handbill, which had been prepared by Harley, then stated the two purposes of the authorization cards—first, "to get an election," and, second, to assure the Union that it would have enough votes to win the election. It concluded with an exhortation to the employees to "SIGN A CARD." In the next few days additional cards were solicited and signed, and by August 14, 1962,

the Union had a total of 198 signatures from a work force of 337.

On August 17, the Company refused to recognize the Union on the strength of its asserted card majority, and insisted that the question of representation be settled in a Board-conducted election. This was no surprise to the Union which, without waiting for the Company's answer, had filed an election petition with the Board. For three months thereafter, both the Company and the Union waged a vigorous campaign to capture the employees' support at the upcoming secret ballot election. Then, on November 1, 1962, the votes were cast and counted and the Union was defeated 184 to 124.

Objections were filed by the Union and the results of the election were set aside on December 18, 1962, and a new election was ordered by the Board's Regional Director. Thereafter, the Union withdrew its petition for an election, and on January 3, 1963 filed unfair labor practice charges alleging that certain pre-election conduct on the part of the petitioner had violated § 8(a) (1), and that its refusal to recognize the Union on August 17 had violated § 8(a) (5).

The Regional Director refused to issue the § 8(a) (5) complaint, apparently relying on Aiello Dairy Farms, 110 N.L. R.B. 1365, which stood for the then applicable Board doctrine that, by submitting to a secret ballot election, a union waived its right to assert an antecedent refusal to bargain against an employer who wins the election. On March 13, 1963, the Union appealed this decision to the Board's General Counsel in Washington, where the case then rested for some fifteen months.

---

1. At the hearing each employee was asked on cross-examination if he had been "told at any time that the Union would use your card to bring the Union into the plant without an election?" to which the answer was invariably in the negative. Cf., NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2 Cir. 1966). Most had not heard of such a use for the card until after the hearing had begun.

2. Such "half-truths" are likely to give employees the "false impression that they will have an opportunity in all events to register their true preferences in the secrecy of the voting booth." NLRB v. S. E. Nichols, 380 F.2d 438, 445 (2 Cir. 1967).

At the time the Union filed its appeal, the General Counsel was aware that the *Aiello* rule was being challenged in Barker's East Main Corp., 142 N.L.R.B. 1194, then pending before the Board, and this prompted him to withhold immediate action in the present case. The *Barker's* decision did not overrule *Aiello,* but the General Counsel was still of the opinion that he could bring about the change, and, with that in view, he selected a few cases which might squarely raise the issue before the Board. His objective was finally achieved in the Board's decision in Bernel Foam Products Co., Inc., 146 N.L.R.B. 1277, which overruled *Aiello* and paved the way for issuance of the § 8(a) (5) complaint against petitioner on June 5, 1964, nearly two years after the alleged violation of the Act.

The progress of the present case was equally deliberate. The hearing, which commenced on July 28, lasted for over two months. Since the Company challenged the validity of many of the authorization cards on which the Union relied to establish itself as bargaining representative, the hearing necessarily involved the examination and cross-examination of a great number of witnesses. But the delay was principally caused by the Trial Examiner who, in an erroneous ruling, refused to permit the employer to cross-examine witnesses. This resulted in an interim appeal to the Board, an adjournment to study the proper procedure by which over two hundred witnesses should be recalled for cross-examination, and the time consumed in recalling and cross-examining them. The Trial Examiner then took eight months in reaching her decision and the Board added four more. This appeal was finally argued almost five full years after the 1962 election.

In its answer to the unfair labor practice charges, petitioner challenged the authority of the General Counsel to issue the complaint after having deliberately withheld action for fifteen months while the Board changed the law. The Trial Examiner and a majority of the Board were of the opinion that neither petitioner nor its employees had suffered prejudice as a result of the unusual procedure which was followed.[3] Noting that a secret ballot election is "normally the best method of determining whether or not the employees desire to be represented by a bargaining agent," the Board then concluded that violations of § 8(a) (1) by the petitioner during the 1962 election campaign precluded the holding of a fair election at the time of the decision and ordered that the petitioner recognize the Union on the strength of the cards in order to effectuate the policies of the Act. The Board's order is dated October 3, 1966.

Under § 10(c) the Board is empowered to take such affirmative remedial action as will effectuate the policies of the Act. In some cases involving § 8(a) (5) violations the bargaining order remedy "may be thought uniquely appropriate," NLRB v. Flomatic Corp., 347 F.2d 74, 79 (2 Cir. 1965), and it is settled that the Board has considerable discretion in the exercise of its remedial function.[4] But this does not mean that it is free to impose a remedy merely "on the basis of experience, without regard to circumstances which may make its application to a particular situation oppressive and therefore not calculated to effectuate a policy of the Act," NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct.

---

3. Board Member Jenkins dissented on this point, saying:
   "Delays of this character in the administrative process are unfair and unduly burdensome to the parties. * * * Lapse of time obscures the facts and makes them more difficult (and expensive) to ascertain."
   The record in this case amply illustrates these observations.

4. § 10(c) authorizes the Board to "take such affirmative action * * * as will effectuate the policies of this Act," and thus defines a wide area of discretion to devise remedies within the stated objective. E. g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

287, 290, 97 L.Ed. 377 (1953), which, in my view, is precisely what the Board has done here.

One objective of the Act is to guarantee that employees have freedom of choice on the question of union representation. That policy is reflected in the right to organize granted by § 7 of the Act, and in the 1947 amendment to that section which expressly adds the right to decline any form of organized representation. The obvious design of the amendment was to "permit employees—as distinguished from boards and unions—to choose their own bargaining agent," NLRB v. Red Arrow Freight Lines, 180 F.2d 585, 586 (5 Cir.), cert. denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950), and to "prevent forcing the unwilling worker into a union," NLRB v. International Union, United A., A. & A. I. Wkrs., 320 F.2d 12, 15 (1 Cir. 1963).

Despite the Board's "no prejudice" observation, I am convinced that a bargaining order, imposed nearly five years after the Union was rejected in a secret ballot election and after numerous delays attributable to the General Counsel, the Trial Examiner and the Board, will work an injustice on a substantial portion of the employees at petitioner's plant by depriving them of the right of free choice guaranteed under § 7. While the General Counsel awaited a change in the law so that he might prosecute this case against petitioner, the composition of the Bryant work force was naturally undergoing change. After further delays at the hearing, the appeal to the Board, and finally the appeal here, sixty-two employees who signed cards in 1962 are no longer employed at petitioner's plant and the size of the appropriate bargaining unit has grown from 337 to 456. Consequently a bargaining order makes the Union, by fiat, the representative of a unit, more than two-thirds of the members of which never had an opportunity to say whether they wanted such representation or not.

This case stands on a different footing from those where an employer has refused to bargain with a duly authorized representative of the employees on the ground that the union may no longer represent a majority of the work force. Where a union has once been validly designated as bargaining representative, it would be a clear subversion of the decertification procedures of § 9(c) to permit the employer to qualify its bargaining obligation by demanding periodic reconfirmation of the union's majority status. NLRB v. Mexia Textile Mills, Inc., 339 U.S. 563, 568, 70 S.Ct. 833, 94 L.Ed. 1067 (1950). Thus, there is good sense to the rule that a "bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed." Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944). These cases, as well as others cited there and in the Court's opinion,[5] all involved unions which had been once validly designated· by the employees as their representative. They are not apposite here where the record fails to show that the employees ever intended to designate the Union as their bargaining agent, and where the changed work force is attributable to extraordinary delays of which petitioner was in no part the cause. Cf. Franks Bros. Co. v. NLRB, supra.

There is no dispute that on August 14, 1962, 198 of 337 eligible Bryant employees had signed union authorization cards. But that does not alone establish the Union's entitlement to recognition where the record shows that cards were obtained by fraud, coercion, or misrepresentation. NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684 (2 Cir. 1966). For instance, a card cannot be counted where the employee signing the card has been told by the person soliciting his

5. NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942); NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. International Union, Progressive Mine Workers of America, 375 U.S. 396, 84 S. Ct. 453, 11 L.Ed.2d 412 (1964).

signature on behalf of the union organizers, that the "sole purpose" is to bring about a secret ballot election, nor is a finding of invalidity limited to such cases. It is recognized that deceptive and devious tactics have become the hall-mark of card campaigns, see Note, Union Authorization Cards, 75 Yale L.J. 805 at 823–828 (1966), and this fact of life in labor-management relations calls for the rejection of the "sole purpose" test as the exclusive means of invalidating a union card, NLRB v. S. E. Nichols Co., 380 F.2d 438, 444–445 (2 Cir. 1967), a result which we thought would invest words such as "sole," "merely," "just" or "only" with a "kind of talismanic quality." NLRB v. Golub Corp., 388 F.2d 921 (2 Cir. 1967).

Although this court has not gone so far as to sanction the investigation of an employee's subjective intent in signing a card where has been no form of misrepresentation made in its acquisition, it has clearly stated that the decisive question in these cases is whether the employees meant to make the union their representative by signing the cards, or whether they understood their actions only as a call for a secret ballot election. NLRB v. S. E. Nichols, supra, 380 F.2d at 444. In my view, this record compels the latter conclusion; certainly the General Counsel has not achieved his burden of proving the contrary by "substantial evidence."

The Examiner counted the cards of twelve employees which Bryant claimed

had been signed only after a specific union organizer had represented that the purpose of the card was to get an election. She relied on the fact that these employees had not been told that the "sole" purpose of the card was to get an election, a legal premise which, it is now clear, is not the law of this circuit, and, in some instances, she based her ruling on the ground that the solicitor "had no authority to speak as an agent of the Union," which is also a consideration we have deemed immaterial so long as the speaker is actively engaged in the solicitation of union cards. See NLRB v. Golub Corp., supra, n. 6 at 923 of 388 F.2d. Of those twelve cards, at least eight are clearly invalid and cannot be counted.[6]

The Examiner gave "no weight" to the testimony of some fifteen other employees who were told before signing that the purpose of the cards was to get an election, primarily because those witnesses were unable to recall who had made the representation, or whether the speaker was an "authorized union solicitor." The inability of the employees to recall what the Examiner considered to be vital details was due to the delay in the commencement of the hearing, for which the General Counsel was responsible. In any event it was sufficient if the representation was made by someone who was soliciting his signature on a card. Accordingly, eleven of these cards should be invalidated because of representations, made at the time they were signed, that there would be an election.[7]

---

**6.** These are the cards of Davidson, Davis, Gray, Hall, Sherer, Westcott, Morris and Perry. The Examiner assumed, without deciding, that the latter two cards should not be counted. The testimony is enlightening: *Davidson:* "He said the card stood for the purpose of an election * * * just for an election. * * * I pointed out what the card read to him and he said for now not to pay any attention to that."; *Davis:* He "told me that if I signed the card there would be an election."; *Gray:* "How about signing a card so we can get an election in the shop?"; *Sherer:* "I was just asked if I would sign one so they could get a majority of cards to get an election. * * *

Well, I knew what it meant. I knew it was a union card meaning an election."; *Westcott:* "He told me what the purpose was, to bring an election."; *Morris:* "Because he told me it was to get an election. There was nothing else that would come out of the cards whatsoever. There was no other purpose."; etc. etc.

**7.** These are the cards of Broderick, Holden, Yessman, Bohen, Delehanty, O'Hara, White, Hoyt, Burbank, LeMere and Lynch. Examples: *Broderick:* "I think the way it was explained to me [was] if we had enough cards in we would hold an election. * * * That is the only reason I was told."; *Delehanty:* "You have to sign the card to get in; * * *

Under the circumstances of this case, petitioner's failure to show conclusively that ten additional cards were obtained by misrepresentation or coercion is not of controlling significance.[8] Where a card majority is reasonably challenged, and where despite the fact that evidence has gone stale, that challenge is supported by proof that as many as nineteen cards are invalid and that the general atmosphere at the time of the campaign was clouded by election-oriented propaganda, the burden should rest with the General Counsel to show by a preponderance of the evidence that the subjective intent to authorize union representation was not vitiated by such extreme circumstances. Cf. Engineers & Fabricators, Inc. v. NLRB, 376 F.2d 482, 487 (5 Cir. 1967).

It is not necessary that misleading representations be conveyed by word of mouth. Thus it has been held that cards which were distributed to employees along with a covering letter, suggesting that they would be used to petition a Board election, cannot, without more, support a bargaining order under § 8(a) (5). Bauer Welding & Metal Fabricators, Inc. v. NLRB, 358 F.2d 766 (8 Cir. 1966). The letter in that case carried a message remarkably similar to that printed in the Union's August 3 handbill, id. at 768–769, and the authority is a persuasive one for the petitioner.[9] But an additional factor here is the likelihood that the multitude of misrepresentations made by specific union solicitors[10] contributed to the more general understanding which existed among the employees that the Union could not win representative status without an election.[11] It is highly likely that in-

you have to have an election to get the union in."; *Yessman:* "That is right. That was the purpose. * * * Well, they needed a majority of cards to hold an election."; *Bohen:* "That it was for an election."; etc., etc.

8. This failure of proof at the hearing was due in large part to the fact that the intentional delay by the General Counsel put beyond the power of recall of most of the employees essential details about the circumstances under which they signed cards. The much shorter delay in Franks Brothers Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944) had no similar prejudicial effect.

9. The record strongly suggests that reliance was in fact placed upon the representation in the August 3 handbill that the cards were "to get an election." Employee Baker testified as follows:
"Q. (By Mr. Petrie) Mr. Baker, prior to the time that you signed the card in 1962 were you told that the purpose of signing the card was to get an election? A. I wasn't told; that's what I understood by reading the union leaflet."

10. The inability of most employees specifically to remember who had solicited their signatures, because of the lapse of time, precludes application in this case of the rule, recognized in NLRB v. Golub Corp., 388 F.2d 921, 924 (2 Cir. 1967), which requires the General Counsel to call as witnesses all the employees whose signa-

tures were sought by those union organizers who generally engaged in misrepresentation concerning the purpose of the cards. Even so, the record discloses that the conduct of at least three solicitors— Hendee, LaFayette and Gavin—was extremely questionable in this regard. This is another area in which the General Counsel derived an unfair advantage from the long, intentional delay.

11. Among the cards not specifically considered by the Trial Examiner were those of Wright, Rowe and Dubanevich. Their testimony illustrates that the reliability of their cards is no greater merely because no specific representation was made by an identified Union solicitor. Thus when Wright first came to work at Bryant he was told by ten to fifteen fellow workers that if he didn't sign a card he'd be the only one in the department who hadn't. *Wright:* "Well, I came in there in the middle of July and they told me in our department that everybody signed one so I signed one. * * * Q. Do you remember what was said? A. If they get enough cards they will have an election. * * * Q. And was there talk that by signing Union cards that they could get the Union in? A. No. No, it was for an election, I was told." *Rowe:* "Q. Was there any talk about the purpose of signing the card? A. Well, none other than to get an election, have an election." *Dubanevich:* "Q. Well, what was all this talk about Union that you heard about? A. To have a Union elec-

formation concerning the cards, like word of employer threats would spread rapidly among the employees, see Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179 (2 Cir. 1965), as was no doubt true of the news that signing at that time might mean an eventual saving of $40 to $50.[12]

Nor can the Board's boilerplate reference to possible lingering effects which petitioner's 1962 § 8(a) (1) violations may have on a new election render its bargaining order a satisfactory alternative. Normally the automatic application of the Board's theory in these cases, a theory which has been ably criticized,[13] is supportable as a reasonable exercise of discretion. But certainly that is not the case here, where the Board's own delays have provided more than ample time for whatever prejudice may originally have emanated from the minor § 8(a) (1) violations, which we have sustained, to dissolve and vanish. It defies reason to say that those violations were of such dramatic force and the words used were so imperishable that after five years they still dominate the thinking of the employees, most of whom were not there at the time, so that they are now unable to exercise their power of choice in a fair election. In my view, the Board's remedy, founded on a contrary assumption, was imposed "without regard to circumstances which make its application to a particular situation oppressive," NLRB v. Seven-Up Bottling Co., supra, 344 U.S. at 349, 73 S.Ct. at 290, and cannot be

sustained. The Board appears to have been so anxious to punish the guilty employer, or to put the union in the saddle regardless of all other considerations, that it has completely ignored the interests of the employees whose rights are of paramount importance but who are represented by no one and who are being deprived of all voice in the matter. To issue a bargaining order and thus compel the employees to accept representation by a union on the basis of cards signed by less than 30% of the current work force is grossly unfair to these employees.

When § 9(c) was rewritten in 1947, Congress indicated that it had come to regard the secret ballot as the best means of effectuating the policies of the Act,[14] which, on occasion, we have found undermined by the requirement of mandatory recognition embodied in a Board bargaining order. NLRB v. Flomatic Corp., 347 F.2d 74, 78 (2 Cir. 1965). Those policies are clearly undermined here where the validity of a majority of the signed cards was not proven, where the § 8(a) (1) violations took place over five years ago, and where over two-thirds of the present employees have never indicated a desire for representation by this Union by signing a card—let alone by vote in a secret ballot election.

The Board's choice of remedy in this case violates § 10(c) of the Act. Therefore the petition for enforcement of the bargaining order should be denied and an election should be ordered.

tion. * * * I attended to my work and then when I knew I was approached to sign the card to have an election, I signed the card."

12. One of the Union's tactics was to make it financially attractive to the employees to sign a card. *Perry* testified that he would not have signed his card had he not been told by solicitor Goodell that "if I didn't sign the card and if the Union come in it would cost me $40 to $50 to join." *Godin* testified to having been told at a Union meeting that "if you signed up now, it wouldn't cost so much later on" and

*Williams* heard that "there was a smaller fee if you got your card in before the Union got in." There is of course no way of telling how many others signed as a financial hedge, intending to vote against the Union at the election.

13. See Note, 75 Yale L.J., supra, at 818–819.

14. The author of the Yale Note finds in the legislative history of the 1947 revisions a Congressional intention to make the secret ballot the exclusive means of selecting a bargaining representative. 75 Yale L.J. at 820.